

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0728-12

**JOHN FRANGIAS, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FOURTEENTH COURT OF APPEALS
### HARRIS COUNTY

PRICE, J., delivered the opinion of the Court in which KELLER, P.J., and WOMACK, JOHNSON, KEASLER, HERVEY, COCHRAN and ALCALA, JJ., joined. MEYERS, J., did not participate.

### O P I N I O N

A jury convicted the appellant of sexual assault and assessed his punishment at eight years' confinement in the penitentiary. Represented by different counsel on appeal, the appellant filed a motion for new trial in which he argued that his trial counsel provided ineffective assistance when they failed 1) to secure the presence of a critical witness at the guilt phase of the trial, 2) take his deposition in order to memorialize his testimony for

presentation to the jury, or 3) alternatively, seek a continuance in order to secure that witness's testimony. The trial court allowed the motion for new trial to be denied by operation of law,[1] and the Fourteenth Court of Appeals upheld that ruling, holding that the trial court did not abuse its discretion because the appellant did not establish that his trial counsel performed deficiently.[2] We granted the appellant's petition for discretionary review in order to examine this holding. We now reverse the judgment of the court of appeals and remand the cause for further proceedings not inconsistent with our holding today.

## FACTS AND PROCEDURAL POSTURE

In March of 2010, the appellant was indicted for the offense of sexual assault, a second degree felony,[3] allegedly committed on or about July 10, 2008. By the time of trial in October of 2010, the appellant was represented by retained attorneys Lisa Jones and Alfred Valdez, both of whom had been on the case since at least early June of 2010. Trial was scheduled to begin with voir dire on Friday, October 22, 2010, but on October 19th, the trial court continued the case until the following Monday, October 25th, in order to allow time for defense witnesses to come in from Canada. The jury was selected on that Monday, and testimony began on Tuesday, October 26th.

---

[1] TEX. R. APP. P. 21.8(c).

[2] *Frangias v. State*, 367 S.W.3d 806, 814-15 & 817 (Tex. App.—Houston [14th Dist.] 2012).

[3] TEX. PENAL CODE § 22.011(a)(1)(A), (b)(1), & (f).

**The Evidence at Trial**

The State's evidence showed that the complainant, K.H., flew from Toronto to Houston to attend a Microsoft conference during the week of July 7, 2008. Upon arrival, she discovered that her hotel was overbooked, and a room was arranged for her at the appellant's hotel, the Rainbow Inn Suites. On the evening of Thursday, July 10th, K.H. attended a social event sponsored by Microsoft. Afterward, she accompanied her business partner to his hotel for about an hour before taking a shuttle back to the Rainbow Inn Suites. She testified that she arrived at around 11:00 p.m. and proceeded upstairs to her room. Arriving on the second floor, she noticed that the appellant was there talking with another patron. When the appellant saw K.H., he excused himself from his conversation and followed her down the hall to her room. There, he pushed her through the door and onto the bed, forcing himself on her. After the appellant left, K.H. brushed her teeth and took a shower to try to eradicate his taste and smell. She then telephoned her husband and a business contact, but she told neither of them about the sexual assault. She explained to the jury that she did not immediately report the assault because she was afraid and humiliated, and she simply wanted to "bury" the incident and pretend that it had not happened.

Testifying on his own behalf, the appellant, a native Greek of longstanding United States citizenship, and proprietor of the Rainbow Inn Suites, imparted a fundamentally different story in halting English. According to the appellant, K.H. arrived at the doorstep

of his hotel shortly after midnight in a state of profound inebriation. After the appellant and one of his employees, Jay Sotomayor, helped K.H. up to her room, she called down to the front desk for additional towels. The appellant took towels up to her room, but he did not tarry. He testified that, over the course of that week, he had driven K.H. to a number of functions and had noticed on several of those occasions that she seemed intoxicated.[4] When she began to ask him inappropriately personal questions, he asked her to find a room at another hotel. At no time did he enter her room, and he "1000 percent" did not sexually assault her. In fact, he claimed to suffer from a chronic kidney stone condition, the treatment for which made it very painful for him to attain an erection.[5]

When she returned to Toronto on July 11th, K.H. telephoned Stephanie Jones, an old acquaintance whom she knew to be a former police detective, and reluctantly told Jones about the assault. Contrary to her trial testimony, K.H. told Jones that the appellant had knocked on her door—not that he had followed her to her room and pushed her through the door—before assaulting her. Jones advised K.H. to immediately tell her husband what had happened and to submit to a medical examination, both of which K.H. did. The rape kit

---

[4] A long-time patron of the hotel also testified that he had observed K.H. several times during the course of the week in an apparently intoxicated state. On one such occasion he observed K.H. in a dispute with the appellant over her room rate, and he advised the appellant that he thought K.H. would eventually prove to be "trouble."

[5] The appellant's wife corroborated his testimony in this regard.

turned up no forensic evidence, however, and the nurse who conducted the examination noticed no bruising or other injury indicative of forcible rape.

Both sides were able to produce testimony to corroborate their respective accounts. One witness, an intensive care nurse who happened to be in the lobby of the Rainbow Inn Suites at around midnight on July 10th, testified that an obviously drunken woman had passed out at the front door and that the appellant and another man had helped her up to her room. The appellant later took towels up to a room, but came back down within minutes. This witness was not asked, however, and evidently could not definitively say, whether the woman she saw was K.H. On the other hand, testimony from K.H.'s business partner, the business contact whom she telephoned after the assault, and her husband, all placed K.H. at the Rainbow Inn Suites substantially *before* midnight. K.H.'s cell phone records apparently backed up this testimony.[6] Based upon this evidence, the prosecutor would later make it a pervasive theme of her guilt phase summation to the jury that the drunken woman whom the defense witnesses had seen at midnight was not, in fact, K.H., but some other unidentified woman.

---

[6] On cross-examination, K.H. admitted that she had reported to the examining nurse in Canada that the assault had occurred just past midnight. She explained that this had been only an estimate, and that, once she obtained her cell phone records, she was able to reconstruct the chronology of events more accurately. The cell phone records themselves were not admitted into evidence, but K.H. testified to their contents extensively, without objection.

**The Missing Witness**

Midway through the first day of testimony, on Tuesday, October 26th, shortly after the lunch break and during the State's case-in-chief, one of the appellant's trial counsel, for the first time on the record, broached the subject of a missing witness, Jay Sotomayor—the Rainbow Inn Suites employee who the appellant would later testify helped him to escort the drunken woman to her room. This first mention, during a bench conference, was fleeting.

> MR. VALDEZ: . . . Your Honor, we need to discuss, there's a witness that we were planning on producing; he's in El Paso at a VA Hospital.

> THE COURT: I'm sorry?

> MR. VALDEZ: He's in the VA Hospital. He's receiving cancer treatment. He's not allowed to travel. We're going to ask maybe during a break to discuss that issue and how we can get his testimony by telephone if we have a court reporter.

> THE COURT: We'll take that up at the break. I'll let you know.

Later, during an afternoon recess, the matter was taken up in greater detail.

> MR. VALDEZ: . . . [T]here is a witness named Jay Sotomayor, S-O-T-O-M-A-Y-O-R. We were looking to bring him to trial today. He's at the VA Hospital, we've been told, for the last four to five months. We just found this out on Friday [October 22[nd]], for receiving cancer, second round of cancer treatment for prostate cancer. It's our understanding, according to Mr. Sotomayor, he's not allowed to travel either by car or by airplane because we had intended to have someone fly down there, pick him up, bring him back in the courtroom and assist him to fly back.

> Consequently, we're trying to make arrangements for tomorrow morning to have a court reporter, who is authorized to administer an oath to go on base there called Fort Bliss in El Paso, Texas, to be there to administer an oath and him to provide testimony by telephone pertaining to this case. The

reason we believe it's pertinent to this case is because he was a part-time housekeeper.

THE COURT: He was what?

MR. VALDEZ: A part-time housekeeper and handyman at the hotel where [the appellant] was working when this incident occurred back in 2007-2008. And his testimony would be according to a statement that I have from him, a copy of an affidavit actually, Your Honor, that indicated that Ms. [K.H.] was intoxicated on the evening that she returned back on July 10th of 2008; that she was stumbling about and that she was drunk. And so that is an issue.

Also, he indicates that he went up, he helped or at least observed [the appellant] go up the stairwell with Ms. [K.H.]. And also when there was an occasion for a call for towels to her room that he observed [the appellant] going up to drop off those towels. And noted that he did not go inside the room at all. And then that [the appellant] returned back downstairs again. So, consequently that's why we believe his testimony is necessary to this case.

[PROSECUTOR]: Judge, the State objects to having a witness testify from another part of the state. In addition, the State believes this testimony is also going to be cumulative based on the witnesses that I know that they're going to call or that they've indicated they're going to call that are going to testify to pretty much the same stuff that they believe the Complainant was intoxicated. So, they won't be harmed by not allowing it.

THE COURT: How long [has he] been over there?

MR. VALDEZ: We've been told, Your Honor, we literally found out on Friday. He's been there approximately four months receiving the cancer treatment; that this was his second round of cancer treatment. We were trying to track him down, and he kind of dropped out of sight on us. And finally we got a text message indicating that he was still receiving cancer treatment at the VA Hospital in El Paso, Texas, which is adjacent to Fort Bliss.

THE COURT: How long has this case been set for trial?

[PROSECUTOR]: For a while, Your Honor. It was set back in June or July.

THE COURT: The Court is not going to allow it. If there is other evidence of the same facts, I'll take it up at that time, determination of what the other witnesses said. There's been plenty of time if he was unavailable to take the deposition prior to this time.

So, bring the jury.

MR. VALDEZ: We did request to take depositions of other witnesses, which the Court had denied previously. But, literally, Your Honor, we were not aware this gentleman was undergoing cancer treatment. And we literally found out that he was unable to be an available witness on Friday.

THE COURT: I'll make my ruling after I hear the testimony.

MR. VALDEZ: Yes, sir.

The topic of Sotomayor's proffered testimony did not come up again until the end of testimony the next day, October 27th, at which time the trial court announced that it would "take that up in the morning."

The next morning, October 28th, defense counsel again urged the trial court to rule on the appellant's request to permit Sotomayor to testify over the telephone:

MR. VALDEZ: . . . We have also the issue of Mr. Jay Sotomayor. He's the gentleman that's at the VA Hospital. And we need to have a ruling as to whether or not the Court will allow us to have a telephone testimony with Mr. Sotomayor. He's suffering from cancer. He's been at the VA Hospital for several months in El Paso, Texas. And it's been represented to us through Mr. Sotomayor that he is, per doctor's instructions is unable to travel.

And from our perspective, Your Honor, we have been attempting to get him served with a subpoena of some sort or at least get him here, I won't say served a subpoena but just get him here. I'll take back the serve with subpoena. But we tried to locate him, and we have found him, but he's not allowed to travel. And his testimony would be, Your Honor, that he saw Ms. [K.H.] in the lobby, that he saw her intoxicated, that he assisted [the appellant]

to take Ms. [K.H.] up the stairway into her room, in 211.

And, thereafter, he observed [the appellant] when he took some towels to the Room 211 later that evening and he did not enter the room, [the appellant] did not enter the room and he was back down.

So, consequently we're requesting the Court to allow Mr. Sotomayor to give testimony from El Paso, Texas. We will have a court reporter there with him to identify him and also to administer the oath to tell the truth, and it will be by telephone, Your Honor.

THE COURT: What says the State?

[PROSECUTOR]: Judge, the State still has the same objection. Without having that witness here, the jury can't adequately determine whether that witness is being credible. In addition, the Defense already has testimony that they're seeking to introduce. They've already put on witnesses that claim they know who [K.H.] is and that that person was intoxicated. So, not allowing them to do this wouldn't cause them any harm.

THE COURT: Once again, the Court have no request – you knew this case was going to trial. I have no subpoena in here indicating that he was served with a subpoena to be here. I have no proof that he's medically incapacitated. That request will be denied.

Shortly thereafter, both sides closed, the trial court read the jury charge, both sides argued, and the jury retired to deliberate. The jury convicted the appellant.

**Motion for New Trial**

After the appellant's retained attorneys withdrew, David Cunningham was appointed to represent the appellant on appeal. On November 29, 2010, he filed a motion for new trial. In it, he alleged that Lisa Jones and Alfred Valdez provided constitutionally ineffective assistance of counsel in failing either to secure Sotomayor's testimony at trial, or to seek a

continuance. In support of this motion, the appellant attached the following matters:

- A notarized statement from Sotomayor, dated July 14, 2010, in which he claims to have seen K.H. intoxicated at the appellant's hotel a few nights after she had checked in; that he watched as the appellant helped her up to her room; that she later called down for extra towels and he again accompanied the appellant up to her room; and that on neither occasion did the appellant enter K.H.'s room.

- An affidavit from Irene Alexander, a paralegal whom the appellant had asked to assist his trial attorneys in trial preparation. Alexander avers that she was "generally aware of the nature" of Sotomayor's testimony at an early point in her involvement in the case, and that, about a week to ten days before testimony commenced she "became aware of the specifics of his anticipated testimony as it was set out in his affidavit." She began to try to locate him at that time and was eventually able to find him at the VA hospital in El Paso, but he told her that his doctors might not let him travel to Houston to testify. On Monday, October 25, 2010, Sotomayor confirmed that he would be unable to travel.

On December 7, 2010, the State filed a responsive affidavit from the appellant's trial counsel, Lisa Jones. According to her affidavit, Jones "had no knowledge of Mr. Sotomayor or his statement" until the Friday before trial, October 22, 2010, and was "surprised" that Alexander did not inform trial counsel of his potential testimony before that. From that point on, trial counsel contacted Sotomayor, tried to arrange for him to travel to Houston for trial and, when informed that this would not be allowable, made arrangements whereby he could testify telephonically or via a live video link. They did not attempt to depose Sotomayor because the trial court had already denied defense requests to depose other witnesses in the case and, in any event, "the jury would not be able to see or hear" Sotomayor to evaluate his credibility. As for the option of seeking a continuance, Jones simply opined that "the filing

of another [motion for] continuance was not practical nor did I believe it would be granted by the Court." There was no affidavit at this point from co-counsel Valdez.

Two days later, on December 9, 2010, the appellant filed a memorandum in support of his motion for new trial. To this memorandum he attached two more affidavits:

- His own affidavit in which he asserts that, when he first retained Jones to represent him, he gave her a list of all of the witnesses who had been in the lobby of the Rainbow Inn Suites on the night of the alleged assault, including Sotomayor. In July of 2010, he learned that Sotomayor would be in Houston, and Jones instructed him to obtain a notarized statement from him. Sotomayor prepared such a statement and gave it to the appellant, who turned it over to Jones and Valdez.

- An affidavit from appellate counsel Cunningham asserting that he found Sotomayor's notarized statement in trial counsel's files, which had been turned over to him in anticipation of his representation of the appellant.

The appellant also filed written objections to the trial court's purported decision to decide the merits of the motion for new trial based on the affidavits alone, without the benefit of live testimony.

On that same day, December 9th, the trial court conducted a hearing on the motion for new trial, confirming its intention to decide the motion on the basis of affidavits alone. The State represented that it had tried to obtain an affidavit from Valdez, who had declined. The appellant proffered written questions he would have asked Jones had she been required to testify at the motion for new trial hearing, which the trial court accepted and made a part of the record. The appellant then formally offered all four of the affidavits that were attached

to his pleadings into evidence for purposes of the motion for new trial hearing, and the trial court admitted them. The State then tendered the affidavit from Jones into evidence. Without pausing to give the trial court a chance to formally accept Jones's affidavit into evidence, however, the prosecutor immediately requested that the trial court order Valdez to also submit an affidavit, after which the following colloquy transpired:

THE COURT: Fine. The Court will order for Mr. Valdez to give a statement.

[PROSECUTOR]: And we'll prepare something in writing for that Court order for the Court to sign. I guess, if we could give him next week, which is still before your deadline [the 75 days], I believe, of January the 12th.

MR. CUNNINGHAM: Judge, you know, Mr. Valdez has told me that if the Court orders me, just call me; and I'll do the affidavit. So, I'll get in touch with him.

THE COURT: Okay.

MR. CUNNINGHAM: And then I guess we'll continue the hearing once we get his affidavit?

THE COURT: Well, and what is the time deadline on this, January the what?

[PROSECUTOR]: 12th, I believe.

MR. CUNNINGHAM: Right.

(Discussion between the Court and attorneys off the record.)

THE COURT: Get those to me. I'll make a determination and give you a ruling.

MR. CUNNINGHAM: And also, I'm going to supplement what I've

submitted to the Court based on what Mr. Valdez provides, if that's fair with the Court.

THE COURT:  That will be fine.

There are two matters of significance to be observed about the above colloquy: first, the trial court never explicitly admitted Jones's affidavit into evidence; and second, the trial court did not expressly agree that it would reconvene the motion for new trial hearing once it had obtained Valdez's (and any responsive) affidavit.

On December 17, 2010, the State filed Valdez's affidavit.  According to Valdez's "best recollection," he learned about Sotomayor's existence and his notarized statement from Alexander, the paralegal, on Friday, October 22nd.  Valdez spoke with Sotomayor either that weekend or on Monday the 25th, the day of jury selection.  In any event, he confirmed that both he and Jones knew as early as Friday that, because of Sotomayor's cancer treatment, there was a possibility that he would not be allowed by his doctors to travel to Houston to testify, but this was not confirmed until Monday.  Moreover, the cancer treatment "was ongoing and would not be concluded in several weeks."  Therefore, on Monday, trial counsel instructed Alexander to begin making arrangements with a court reporter in El Paso to "administer the oath to tell the truth to Sotomayor and also be able to identify him as the individual Jay Sotomayor."  They also began to make arrangements "to set up a web-cam feed to the courtroom in Houston, Texas, or alternatively, a telephone feed[.]"[7]  Valdez

---

[7]  Valdez also asserts in his affidavit that he "addressed the Court on two (2) occasions during

opined that Sotomayor was a friendly witness who had expressed a willingness to testify on the appellant's behalf if he could. "Consequently, a subpoena would not have brought him to Houston, Texas to give testimony." With respect to seeking a motion for continuance, Valdez believed it was neither "necessary" nor "beneficial." In the first place, he believed that a continuance would have been impractical because of other witnesses who had to travel to Houston from out of state. And in any event, a continuance was not needed because trial counsel had already made extensive arrangements to have Sotomayor testify telephonically or via "live picture feed into the courtroom." And finally, with respect to the option of deposing Sotomayor, like Jones, Valdez objected that "[i]f a deposition of this witness was taken, the jury would not be able to see him in person!" Valdez confirmed the importance of Sotomayor as the only available defense witness who could corroborate the appellant's testimony that K.H. was the intoxicated woman he had helped up to her room and that the appellant never entered her room.

The appellant filed no additional affidavits in response to Valdez's and lodged no further objections to the manner in which the motion for new trial was resolved. The trial court never reconvened the hearing. Rather than make an explicit ruling on the motion, the trial court allowed it to be denied by operation of law.

---

the trial about allowing the [appellant] to put on testimony of Sotomayor by telephone and/or video feed." While the record excerpts from trial, as set out above, confirm that Valdez twice mentioned *telephonic* testimony to the trial court, there was simply no mention—at least none on the record—of the possibility of video testimony or of a "web-cam feed" in the courtroom.

## On Appeal

On appeal, the appellant failed to contest the manner in which the trial court adjudicated his motion for new trial. He did not complain that the trial court resolved the motion on affidavits without permitting live testimony at the hearing. Instead, he simply argued that, given the appellate record and the documentary evidence, the trial court erred in allowing the motion for new trial to be denied by operation of law. In the Statement of Facts in his appellate brief, the appellant pointed out that the trial court never explicitly admitted the affidavits of Jones and Valdez into evidence during the hearing on his motion for new trial, suggesting that for this reason they do not constitute competent evidence for purposes of appellate review.[8] He argued that, based upon his own affidavits, which *were* formally admitted at the hearing, he had conclusively established trial counsel's ineffectiveness. The State did not directly address the appellant's argument that Jones's and Valdez's affidavits did not count as substantive evidence, but simply treated them as such in its appellate brief.[9]

On the other hand, the State challenged the legitimacy of Sotomayor's notarized statement on the ground that it did not establish on its face that Sotomayor had actually been

---

[8] Appellant's Brief on Direct Appeal at 19-20.

[9] State's Appellate Brief at 9-10.

placed under oath by the notary when he executed it.[10]   In a reply brief, the appellant

countered that Sotomayor's statement was "properly before the Court" if only because the

State forfeited any complaint about its unsworn character by failing to object to it on that

basis (or any other) when it was admitted at the motion for new trial hearing.[11]

The court of appeals did not address any of these competing contentions.  It simply

considered all of the affidavits in the record, without regard to whether they were properly

sworn or formally admitted into evidence at the hearing, and held that the trial court did not

abuse its discretion in denying the appellant's motion for new trial.[12]   First, the court of

appeals held that the record supports a presumptive finding by the trial court that appellant's

defense team did not subpoena Sotomayor or seek to depose him prior to trial because they

were unaware of his whereabouts before Friday, October 22, 2010.[13]   It would have been

useless to seek to depose Sotomayor by that time, the court of appeals held, because, "as the

trial court pointed out on the record, there was no proof that Sotomayor was medically

incapable of travel."[14]   Moreover, any request for a deposition would have been untimely,

---

[10] *Id*. at 8 & n.1.

[11] Appellant's Reply Brief on Direct Appeal at 1-2.

[12] *Frangias*, *supra*, at 817.

[13] *Id*. at 813.

[14] *Id*. at 814.

given that the indictment had been pending for nearly a year, and the trial court would have been within its rights to deny it on that basis.[15] For these reasons, the appellant's trial counsel were not operating outside the bounds of prevailing professional norms in failing to secure Sotomayor's testimony, either live or by deposition.[16]

Turning next to the question whether trial counsel performed deficiently in failing to seek a continuance, the court of appeals pointed to Jones's assertion that she did not seek one because she did not think it would be granted. The court of appeals agreed, reiterating that there was no sworn showing that Sotomayor was medically incapacitated, and adding that, because the appellant had already obtained one (albeit brief) continuance in the case, he would be required to show that he reasonably expected to be able to produce the witness's testimony "at the next term of the court."[17] "Because there is no evidence that defense counsel could have made such a showing," the court of appeals concluded, "we cannot say that defense counsel rendered ineffective assistance by failing to move for a further continuance."[18] Thus, the court of appeals resolved the appellant's contentions by holding

---

[15] *Id*.

[16] *Id*.

[17] *Id*. at 815 (quoting TEX. CODE CRIM. PROC. art. 29.07) (internal quotation marks omitted).

[18] *Id*. In a motion for rehearing, the appellant argued that the court of appeals should reconsider its opinion on original submission with respect to its holding that there was no evidence that Sotomayor's testimony could reasonably be expected to be procured by the next term of the court, as is required for a second motion for continuance. Appellant's Petition for Rehearing at 6. Ironically,

that the appellant failed to establish that his trial counsel performed deficiently for purposes of fulfilling the first prong of *Strickland v. Washington*,[19] and so the trial court did not abuse its discretion to deny his motion for new trial.[20] The court of appeals offered no opinion with respect to the second prong of the *Strickland* standard—whether the appellant was prejudiced by any deficiencies in trial counsel's representation.[21]

## On Discretionary Review

In his petition for discretionary review, the appellant contends that all of the justifications offered by the court of appeals for why the trial court could have denied defense motions to take Sotomayor's deposition or continue the case were themselves the product of trial counsel's deficiencies. Even assuming that his trial counsel were unaware of Sotomayor's existence, location, and proposed testimony until the Friday before trial began, the appellant contends, the fact that they may not have succeeded in persuading the trial court to grant a deposition or a continuance at that late date was due entirely to deficiencies in their own performance. We granted the appellant's petition in order to

---

he cites to the affidavit of Lisa Jones as the evidentiary support for this proposition. *Id*. The court of appeals denied his motion for rehearing without comment.

[19] 466 U.S. 668 (1984).

[20] *Frangias*, *supra*, at 817.

[21] *See Strickland*, *supra*, at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one.").

consider these contentions. We hold that, by any view of the evidence, the court of appeals erred in failing to conclude that the appellant's trial counsel performed deficiently; we therefore remand the cause to the court of appeals to determine whether the trial court could have properly denied the appellant's motion for new trial on the ground that he failed to satisfy the prejudice component of *Strickland* and to address any evidentiary issues the parties have raised that may prove necessary in order to make that determination.

## THE STANDARD

An appellant claiming constitutionally ineffective assistance of counsel must establish both that his trial counsel performed deficiently and that the deficiency operated to prejudice him.[22] Because the court of appeals addressed only the performance prong of *Strickland* and did not reach the prejudice prong, our review today is similarly circumscribed. In evaluating the performance prong, reviewing courts must not second-guess informed strategic or tactical decisions made by trial counsel in the midst of trial, but instead "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]"[23] This means that, unless there is a record sufficient to demonstrate that counsel's conduct was not the product of an informed strategic or tactical decision, a reviewing court should presume that trial counsel's performance was constitutionally

---

[22] *Id*. at 687.

[23] *Id*. at 689.

adequate "unless the challenged conduct was so outrageous that no competent attorney would have engaged in it."[24] Reviewing courts are obliged to defer to strategic and tactical decisions of trial counsel, so long as those decisions are informed by adequate investigation of the facts of the case and the governing law.[25] Moreover, an accused is not entitled to representation that is wholly errorless, and a reviewing court must look to the totality of the representation in gauging the adequacy of counsel's performance.[26] But even a single instance of attorney error can rise to the level of deficient performance, if the error was egregious and had a seriously deleterious impact on the balance of the representation.[27] "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms[,]" and "[c]ounsel . . . has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process."[28] The appellant argues that his trial counsel failed to bring to bear the requisite degree of skill and knowledge

---

[24] *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (internal quotation marks omitted).

[25] *Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990).

[26] *Id*.

[27] *Vasquez v. State*, 830 S.W.2d 948 (Tex. Crim. App. 1992); *Ex parte Zepeda*, 819 S.W.2d 874 (Tex. Crim. App. 1991). *See* George E. Dix & John M. Schmolesky, 42 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 29:77, at 848 (3d ed. 2011) ("[A] single error can render counsel's performance ineffective, if its consequences are so severe that 'it permeates the entirety of [counsel's] representation.'" (quoting *Jackson v. State*, 766 S.W.2d 504, 511 n.6 (Tex. Crim. App. 1985))).

[28] *Strickland*, *supra*, at 688.

to his case as to assure a reliable adversarial proceeding. We agree.

## ANALYSIS

Both sides now renew their challenges to the other side's documentary evidence. The court of appeals did not address any of these contentions. Because we conclude that, even considering all of the evidence in the case, the court of appeals erred to conclude that the appellant's trial counsel did not render deficient performance, we will assume, without deciding, that all of the evidence was properly before the trial court.

### Strategy

The appellate record amply demonstrates that the failure to introduce testimony from Sotomayor was not the product of any considered strategy on the part of the appellant's trial counsel. From the record excerpts set out above, it is evident that they believed his testimony was a critical component of their defense and that they fervently wished to present it. It is not hard to see why they would regard Sotomayor's testimony so. Judging by Sotomayor's notarized statement and Alexander's affidavit,[29] Sotomayor was the only witness who could directly corroborate the appellant's account that the drunken woman who arrived at the hotel at around midnight was K.H. and that he never entered her room.[30] The affidavits of Jones

---

[29]

In her affidavit, Alexander avers that Sotomoyor's testimony would have been "essential" to the defense because "he had information that was supportive of [the appellant's] claim that he (a) did not have any sort of sexual contact or intercourse with the complainant and (b) did not enter the complainant's room on the night in question."

[30]

At trial, the appellant attempted to introduce a written statement from James Murrell, another

and Valdez confirm that they both regarded Sotomayor's putative testimony as "exculpatory," at least "beneficial," if not "critical" to the appellant's defense, and not redundant of other defensive evidence, as the State claimed at trial.[31]

Not surprisingly, then, the court of appeals did not purport to rely on the ordinary appellate presumption that trial counsel's omission was the product of a legitimate trial strategy. Instead, the court of appeals seems to have determined that, once their initial gambit for executing that strategy—remote sworn testimony via telephone, web-cam, or video link—failed, the appellant's trial counsel made a reasonable decision *not* to pursue any other tactic to ensure that the jury would be able to hear Sotomayor's admittedly "critical" testimony. Because neither a deposition nor a continuance was a feasible alternative, the court of appeals held, trial counsel did not perform deficiently by failing to ask for them. We agree with the appellant, however, that the abandonment of alternative ways of implementing

---

witness in the lobby of the hotel, which also indicated that the drunken woman was K.H., that the appellant helped her up to her room but then came right back down, and that he later took towels up to her room but again came right back down. Murrell had died prior to the appellant's trial, however, and the trial court sustained the State's objection to Murrell's unsworn out-of-court statement.

[31] Valdez's affidavit asserts:

As to the [State's] objection to redundancy, Mr. Sotomayor's testimony supported the testimony of [the appellant]; Mr. Sotomayor's testimony verified that [the appellant] did not enter Ms. [K.H.]'s room; Mr. Sotomayor's testimony stated that Ms. [K.H.] appeared to be intoxicated on the night of the alleged sexual assault; this testimony is totally contrary to Ms. [K.H.]'s testimony that she was not intoxicated. Finally, the testimony of Mr. Sotomayor further supported the position that the lady on the ground outside the hotel lobby door was that of Ms. [K.H.] and not some other individual as asserted by the prosecutor.

a particular trial strategy is reasonable only if trial counsel have undertaken reasonable efforts to pursue those alternatives—by conducting a reasonable investigation and then bringing a professionally appropriate level of knowledge and skill to bear—before deciding to abandon them. If the likelihood that the trial court would not have granted a request for a deposition or continuance in the appellant's case is itself attributable to trial counsel's lack of diligence in preparing for the contingency that their first gambit might fail, we cannot fairly characterize trial counsel's performance as reasonable for Sixth Amendment purposes.

## Deposition

Viewing the record in the light most favorable to the trial court's ultimate ruling, the court of appeals took for granted that the trial court had found, as a factual matter, that trial counsel were unaware of Sotomayor's location and the particulars of his account until Alexander told them on the Friday (October 22nd) before trial started.[32] By that weekend, trial counsel were endeavoring to obtain the services of a court reporter in an effort to

---

[32] *Frangias*, *supra* at 813. The appellant's affidavit contends that he told Jones about Sotomayor's potential testimony as early as June of 2010 and that she instructed him to obtain a sworn statement in July, when he told her Sotomayor would be in Houston. And indeed, Sotomayor's written statement purports on its face to have been notarized on July 14, 2010—consistent with the appellant's account. Nevertheless, like the court of appeals, we will presume that the trial court chose to believe trial counsel's assertions that they did not become aware of the nature of Sotomayor's testimony or his whereabouts until October 22nd, when Alexander told them. We observe, however, that neither Jones nor Valdez offered to explain in their affidavits why their investigation of the case had not already uncovered such an obvious and critical witness. Indeed, among the many questions that the appellant proffered to the trial court in support of his written objections to its denial of a live evidentiary hearing on his motion for new trial were several directed at Jones that would have required her to explain the extent of her investigation leading up to October 22nd and how she could possibly have conducted a constitutionally adequate investigation and not already found Sotomayor.

arrange Sotomayor's remote testimony. They did not also immediately seek to depose Sotomayor because, as Valdez expressed it, "the jury would not be able to see him in person!" They offered no further explanation.

The court of appeals held that they were not deficient in failing to pursue a deposition because, in any event, the trial court could readily have denied such a request, on any of the following three grounds.[33] First, when a criminal defendant seeks to use a deposition at trial, he must personally file an affidavit along with his application to depose.[34] Here, there was no affidavit from the appellant.[35] Second, no formal proof was offered to the trial court by anyone with firsthand knowledge "that Sotomayor was medically incapable of travel."[36] Finally, any request for a deposition with trial so imminent could have been denied as untimely.[37] In our view, however, the first two grounds are directly attributable to deficiencies in trial counsel's performance, while the last is not reasonably supported by the case law that the court of appeals cited.

We are aware of no provision in the Code of Criminal Procedure that speaks to the

---

[33] *Id*. at 813-14.

[34] TEX. CODE CRIM. PROC. arts. 39.02 & 39.12.

[35] *Frangias*, *supra*, at 813.

[36] *Id*. at 814.

[37] *Id*.

admissibility of trial testimony of an ordinary witness via telephone or video link. By contrast, Chapter 39 of the Code expressly contemplates the admissibility of testimony by deposition under certain enumerated circumstances when a witness is missing. If a putative witness is unavailable "by reason of . . . bodily infirmity" and therefore "cannot attend" trial, a defendant may "read" the witness's deposition testimony at trial.[38] But he must first show that there is "good reason" to take the witness's deposition and, if he intends to use that deposition at trial, he must personally swear out the affidavit that accompanies the application to depose.[39] The court of appeals correctly observed that depositions are extraordinary and subject to the broad discretion of the trial court, but also that it is appropriate to grant a deposition "if the witness has information critical to a significant factor at trial, or if the witness has exclusive possession of certain information."[40]

From trial counsel's own affidavits it is apparent that, with the proper documentation, they should have been able to meet this standard and therefore positioned themselves to make a persuasive argument to the trial court that it should exercise its discretion to allow Sotomayor's deposition. After all, trial counsel displayed the wherewithal to make weekend arrangements for a court reporter in contemplation of the contingency that the trial court

---

[38]

TEX. CODE CRIM. PROC. art. 39.12.

[39]

TEX. CODE CRIM. PROC. art. 39.02.

[40]

*Frangias*, *supra*, at 812 n.3 (citing, *inter alia*, *Janecka v. State*, 937 S.W.2d 456, 468-70 (Tex. Crim. App. 1996) (per curiam)).

would allow telephonic or video-link testimony over an inevitable State's objection. It is not hard to imagine that trial counsel could at least as readily have obtained affidavits from their own client and from Sotomayor himself, if not his doctor, to satisfy the statutorily governed (and therefore more definite) criteria for taking deposition testimony and admitting it at trial—establishing both the good cause to take Sotomayor's deposition and the verity of the medical condition that prevented him from traveling. We do not think it was reasonable for trial counsel to prefer the first, unregulated method for implementing their trial strategy to the *exclusion* of the second, statutorily authorized method.

Both of the appellant's trial counsel complained in their respective affidavits that the jury would not have been able "to see" Sotomayor. If by this they meant to suggest that his deposition testimony would have been objectionable on this basis alone, they are inexcusably mistaken about the law. Article 39.12 of the Code of Criminal Procedure clearly contemplates that deposition testimony may be "read" at trial so long as the statutory criteria are met, regardless of the jury's inability "to see" the witness.[41] Perhaps, alternatively, trial counsel meant to indicate that they would have preferred that the jurors not even hear Sotomayor's testimony unless they could also "see" it, so that they could evaluate his credibility, for instance. But, given the unique importance of Sotomayor's testimony to the appellant's defense, we would not regard this as a choice that any reasonable trial attorney

---

[41] TEX. CODE CRIM. PROC. art. 39.12.

would make. The appellant had absolutely nothing to lose by admitting Sotomayor's deposition, even if it constitutes a sub-optimal form of testimony. For these reasons we reject the only explanation that trial counsel offered for failing to seek a deposition.

What, then, about the timeliness of an application to take Sotomayor's deposition? Even had trial counsel presented it before jury selection started on Monday, the court of appeals held, the trial court could have denied it solely on the basis that it would have been filed after "the indictment had been pending for just three days less than a year, [the] appellant had been represented by his two retained attorneys for more than four months, the trial was repeatedly set and rescheduled; and the trial court previously continued the case at [the] appellant's request."[42] For the proposition that such an application would be untimely, the court of appeals cited several cases holding that a trial court does not abuse its discretion to deny an application for deposition filed on the eve of trial.

Insofar as we can tell, however, each of these cases involves a defendant's application to depose State's witnesses, in a bald and belated attempt at discovery.[43] In this case, the

---

[42]

*Frangias*, *supra*, at 814.

[43]

*See Langston v. State*, 416 S.W.2d 821, 822 (Tex. Crim. App. 1967) (trial court did not abuse its discretion to deny application to depose a State's witness three days before trial was set to begin when trial counsel had had two months to prepare); *Jasso v. State*, 699 S.W.2d 658, 662-63 (Tex. App.—San Antonio 1985, no pet.) (trial court did not abuse its discretion to deny the defendant's motion to depose the prosecutrix four days before trial for the express purpose of discovering "the nature of [her] testimony" where the motion was not timely and the record revealed that the defendant was not disadvantaged by the lack of discovery). *See also Aguilar v. State*, 468 S.W.2d 75, 78-79 (Tex. Crim. App. 1971) (citing *Langston*, *supra*, to hold that no abuse of discretion to deny application to depose multiple witnesses unidentified in the opinion because the application was not filed until the

application to depose Sotomayor would not constitute an abusive attempt at discovery, but instead (assuming that trial counsel were genuinely unaware of Sotomayor's existence, location, and unavailability to testify in person until the Friday before trial, notwithstanding their own diligent investigation), a reasonably timely attempt to preserve critical testimony that might otherwise be lost.[44]  Chapter 39 imposes no hard and fast deadline for the filing of an application for deposition.[45]  It is far from a foregone conclusion that the trial court would have denied an application to depose Sotomayor as time-barred on the facts presented. Indeed, the trial court might well have granted it, and trial counsel cannot be excused from making the attempt, if only to preserve the issue for appeal.  In any event, even if the trial court could justifiably have denied an application for continuance on the ground that

---

very day of trial and the defendant had announced that he was ready for trial two days before).

[44]

*See Collins v. State*, 24 Tex. App. 141, 149-50, 5 S.W. 848, 850 (1887) (construing "bodily infirmity" for purposes of the predecessor to Article 39.12 and holding that the infirmity need not be permanent so long as witness cannot presently attend trial; trial court "did not err in permitting his [deposition] testimony to be read"); *Freeman v. State*, 115 Tex. Crim. 66, 69, 30 S.W.2d 330, 331 (1930) (disavowing *Collins*'s construction of the statute to the extent that it is the State that seeks to use deposition testimony of a witness who is not *permanently* disabled, observing that to permit the State to do so "where the impediment to the attendance of the witness is merely of a temporary nature" would impinge upon a criminal defendant's constitutional rights to confrontation and compulsory process);  George E. Dix & John M. Schmolesky, 42 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 27:106, at 618 (3rd ed. 2011) ("Until the 1965 revision of the Code [of Criminal Procedure], . . . depositions were designed primarily and perhaps exclusively to preserve testimony and procure it from infirm and out-of-State witnesses."); *id*. § 27:116, at 626 ("The deposition process is, of course, clearly still available to preserve testimony.").

[45]

 Dix & Schmolesky, *supra*, § 27:108, at 620 ("There is [not] a rigid timeframe [for filing applications to depose] imposed by the Code.").

Sotomayor's "infirmity" did not render him *permanently* unavailable,[46] trial counsel might still have used such a request to tactical advantage in an attempt to persuade the trial court, alternatively, to grant a second continuance of the case until such time as Sotomayor could become available.[47]

## Continuance

With respect to the appellant's claim that his trial counsel should also have sought a second continuance, the court of appeals found no deficient performance because "there is no evidence that [the] appellant's trial counsel could have met the statutory requirements governing such motions[.]"[48] First, "[a]ll motions for continuance must be sworn to by a person having personal knowledge of the facts relied on for the continuance."[49] Because there was "no evidence that anyone with personal knowledge of Sotomayor's condition was willing to swear that [Sotomayor] was medically unable to travel to Houston" for trial, the

---

[46]

*See Freeman*, *supra*.

[47]

The record presents no particular reason to doubt that counsel could have obtained affidavits from the appellant and from Sotomayor or his doctor by Monday, the day jury selection began. Neither Jones nor Valdez has explained in their respective affidavits why they did not divulge to the trial court the need to secure Sotomayor's testimony—one way or another—any sooner than at midday during the testimony on Tuesday. If an application to depose Sotomayor that would have been reasonable and timely if made on Monday morning is rendered abusively late because trial counsel inexplicably waited until midday Tuesday to file it, that is just another deficiency in their performance.

[48]

*Frangias*, *supra*, at 814-15.

[49]

*Id*. at 815 (quoting TEX. CODE CRIM. PROC. art. 29.08) (internal quotation marks omitted).

court of appeals suggested, this statutory requisite was not satisfied.[50]

This strikes us as an overly parsimonious view of the record, at least considering (as the court of appeals did) the totality of the affidavits, including the State's affidavits from trial counsel. Alexander, the paralegal, asserted that she made a concerted effort to locate Sotomayor during the week before trial. When she was finally able to speak to him on Friday, October 22nd, "[h]e was more than willing to come to Houston to provide testimony consistent with" his notarized statement. When Jones spoke to Sotomayor the next day, according to her affidavit, "[h]e informed [her] that he wanted to come and testify." Valdez confirms that, sometime during that weekend, "Jones informed me that Mr. Sotomayor was willing to come to Houston, Texas, but he had to clear it with his doctor." Both attorneys claim that they did not believe it was necessary to subpoena Sotomayor precisely because he was such a "willing" witness. It is no great stretch to infer from the totality of the documentary evidence that, had the appellant's trial counsel simply *asked* Sotomayor to provide an affidavit in support of a motion for continuance, once it became apparent that his doctor would not "clear" him to travel, to the effect that his medical condition rendered him unavailable to testify, he would eagerly have supplied one. That trial counsel did not anticipate the need for such an affidavit is but another indication of their deficiency—either deficient knowledge of the statutory requisites for a motion for continuance, or deficient

---

[50] *Id.*

diligence in capturing Sotomayor's testimony.

The second statutory requirement for a motion for continuance that the court of appeals found lacking was any demonstration that the appellant had a reasonable expectation of procuring Sotomayor's testimony for trial at the next term of the court.[51] But, while this circumstance may yet prove an insurmountable impediment to the appellant's satisfaction of the prejudice prong of *Strickland*—a question that we leave to the court of appeals to consider on remand—we do not regard it as determinative of the performance prong. The affidavits of Alexander, Jones, and Valdez all establish that, at the time of the appellant's trial, Sotomayor was undergoing chemotherapy treatment at the Veterans Administration Hospital in El Paso. Jones and Valdez each assert that the treatment was for "cancer," but they do not identify a particular form of cancer.[52] Valdez indicates that, as of the time of trial, "Mr. Sotomayor's cancer treatment was ongoing and would not be concluded in several weeks." Moreover, he was told by Alexander that, "as of early December 2010, Mr.

---

[51] *Id*. at 815. *See* TEX. CODE CRIM. PROC. art. 29.07(2) ("Subsequent motions for continuance on the part of the defendant shall, in addition to the requisites in [Article 29.06], state also . . . [t]hat the defendant has reasonable expectation of procuring [the missing witness's testimony] at the next term of the court.").

[52] At trial, Valdez represented to the trial court that Sotomayor was suffering from prostate cancer. *See* p. 6, *ante*. According to the American Cancer Society's web site, men who have been diagnosed with prostate cancer have a 5-year "relative survival rate" (that is, as compared with other men of the same age who have not been diagnosed with cancer) of 100%. Their 10-year "relative survival rate" is 98%, while their 15 year "relative survival rate" is 91%. *See Survival Rates for Prostate Cancer*, CANCER.ORG, http://www.cancer.org/cancer/prostatecancer/overguide/prostate-cancer-overview-survival-rates (last updated Jan. 17, 2013). In their affidavits, however, neither Jones nor Valdez confirms that Sotomayor's cancer was of the prostate.

Sotomayor [was] still undergoing cancer treatment and that he [was] scheduled for surgery as it pertains to the cancer treatment." But the "next term" of the 262nd District Court of Harris County would have extended from the first Monday in November of 2010 through the first four business days of February of 2011.[53] There is nothing in the record necessarily to

---

[53]

    *See* TEX. GOV'T CODE § 24.439(c) ("The terms of the 262nd District Court begin on the first Mondays in February, May, August, and November. Each term continues until the court has disposed of the business for that term."). We judicially notice that the first Monday of February 2011 fell on February 7th. In order to satisfy the literal terms of Article 29.07(2), then, the appellant's trial counsel would have had to show that he could reasonably expect to procure Sotomayor's testimony for any trial setting that would begin no later than Friday, February 4, 2011.

    Professors Dix and Schmolesky have suggested that the rubric of "terms of court" has become anachronistic for purposes of requests for the delay of trials. "Modern practice, under which the terms of the trial court are usually of no significance, makes the formal statutory requirements totally unrealistic." George E. Dix & John M. Schmolesky, 43 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 33:43, at 199 (3rd ed. 2011). They go on to suggest that

> [w]hat would most reasonably be required are two separate things. First, the moving party should be required to specify the approximate delay the party believes necessary to . . . produce the witness. Second, the moving party should be required to represent that there is a reasonable expectation of procuring the witness during that time.

*Id*. Elsewhere in their treatise they observe that,

> [a]lthough the courts have not made this explicit, the case law effectively means that a party seeking any delay must demonstrate a reasonable likelihood (i.e., a "probability") of securing the witness's presence if the trial court grants the delay requested. This is the case regardless of whether the delay sought would move the case into the next term of the trial court. The better practice would certainly be to require the party both to specify the delay sought and to demonstrate the likelihood of the witness being secured within the requested time period.

*See id*, § 33:52, at 210-11 (footnotes omitted). Given our ultimate disposition of the issue *post*, we need not contemplate the propriety of taking such liberties with the statutory language in the present case.

suggest that Sotomayor's cancer was terminal or that he could not possibly be available to travel for the next two months, notwithstanding any treatment or surgery he had scheduled for early December of 2010. More importantly, there is nothing in the affidavits of Jones and Valdez to suggest that they even thought to investigate this possibility in pursuit of a second motion for continuance.

Instead, because other witnesses had to travel from out of state and Canada, Jones opined that "the filing of another continuance was not practical nor did I believe it would be granted by the Court." Valdez similarly believed "that it was not necessary or beneficial" to file a motion for continuance on account of Sotomayor's absence, both because the defense was already poised to offer his testimony electronically from El Paso, should the trial court permit it, and because other witnesses would be inconvenienced by a delay. But neither Jones nor Valdez offered the opinion (nor plausibly could have, in our estimation) that any of the defense witnesses that they actually *did* call at trial (other than the appellant himself) was more critical to their chosen defensive posture than Sotomayor. It was therefore incumbent upon them to conduct an investigation that was adequate to determine whether it was possible to satisfy the statutory criteria for a second continuance that would assure Sotomayor's presence to testify.[54] Given the obvious and overriding importance of

---

[54] In order to perform adequately, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, *supra*, at 691. Perhaps (although they have not expressly said so) Jones and Valdez believed that the trial court would not likely grant a second motion for continuance— even assuming that they could have satisfied the statutory criteria—so there was no point in investigating. With so little to lose and so much to gain

Sotomayor's testimony to trial counsel's admitted strategy for defending the case, we cannot permit their uninformed pessimism that the trial court would actually grant a second motion for continuance to excuse their failure to investigate and pursue it in the first place by the simple expedient of inquiring of Sotomayor or his doctor whether his medical condition would prevent him from testifying at any time over the next several months. They evidently made no such inquiry.

## CONCLUSION

For the above reasons, we hold that the court of appeals erred to conclude that trial counsel's performance did not fall below the threshold of reasonableness under prevailing professional norms, for purposes of a first-prong *Strickland* analysis. This does not necessarily mean, of course, that the trial court erred to deny the appellant's motion for new trial. There remains the question of whether it was within the trial court's considerable discretion to allow the motion for new trial to be denied by operation of law on the ground

---

by *trying* to obtain a continuance, however, they cannot have *reasonably* decided that such an investigation was unnecessary. *Cf. Wiggins v. Smith*, 539 U.S. 510, 522 (2003) (focusing not on whether trial counsel performed ineffectively by failing to present mitigating evidence at capital punishment phase, but whether the investigation that informed the decision not to present that evidence was adequate); *Ex parte Briggs*, 187 S.W.3d 458, 466-69 (Tex. Crim. App. 2005) (trial counsel performs deficiently by making a purely "economic" decision not to fully investigate potential defensive evidence). If nothing else, an investigation resulting in an affidavit from a "willing" Sotomayor or his doctor demonstrating that he should be available to testify at least before the end of the next term of court would, if all other statutory criteria were met, present a reasonable basis for appeal in the event that the trial court should deny a second continuance—and perhaps a retrial, should the appeal succeed, at which Sotomayor would be able to testify.

that the appellant failed to satisfy the prejudice prong of *Strickland*.[55] As we have noted repeatedly, the court of appeals did not reach the prejudice prong of *Strickland*. Moreover, in addressing the question of prejudice, it may also be necessary to resolve the competing contentions with regard to the evidentiary status of the various affidavits submitted by the parties—another issue that was raised, at least incidentally, but not resolved originally by the court of appeals. When there is no decision of the court of appeals on a particular issue in a case, this Court does not ordinarily reach that issue in the first instance.[56] Especially when the proper resolution of such extant matters is not plain, we will allow the court of appeals to pass upon them first and review the lower appellate court's decision on remand only as we deem fit in our capacity as a discretionary review court.[57] Accordingly, we reverse the judgment of the court of appeals and remand the cause to that court for further consideration not inconsistent with this opinion.

DELIVERED:     February 27, 2013
PUBLISH

---

[55] *See Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004) (appellate court reviews ruling on motion for new trial under abuse of discretion standard, reversing only when no reasonable view of the record could support the trial court's ruling).

[56] *E.g.*, *Keehn v. State*, 279 S.W.3d 330, 334 (Tex. Crim. App. 2009).

[57] *See Fuller v. State*, 363 S.W.3d 583, 589 n.30 (Tex. Crim. App. 2012) (for the sake of judicial economy, this Court *may* pass upon the question of harm in the first instance, but only when it is plain that the error is harmless, *vel non*; ordinarily, we do not exercise our discretionary review authority to make an initial harm analysis).