

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. WR-78,106-01

### EX PARTE DOUGLAS TYRONE ARMSTRONG

### ON APPLICATION FOR WRIT OF HABEAS CORPUS
### CAUSE NO. CR-2095-06-G IN THE 370TH JUDICIAL DISTRICT COURT
### HIDALGO COUNTY

*Per curiam. KELLER, P.J., dissents.*

### <u>ORDER</u>

This is a post-conviction application for writ of habeas corpus filed pursuant to the provisions of Texas Code of Criminal Procedure article 11.071. Applicant was convicted in January 2007 of capital murder committed in April 2006. TEX. PENAL CODE ANN. § 19.03(a). Based on the jury's answers to the special issues set forth in the Texas Code of Criminal Procedure, Article 37.071, sections 2(b) and 2(e), the trial court sentenced him to

death. Art. 37.071, § 2(g).[1] This Court affirmed applicant's conviction and sentence on direct appeal. *Armstrong v. State,* No. AP-75,706 (Tex. Crim. App. Jan. 27, 2010) (not designated for publication). Applicant filed his initial post-conviction application for writ of habeas corpus in the convicting court on February 19, 2009. He filed his second habeas application on November 18, 2011. He filed his third habeas application on July 12, 2012. Applicant filed his fourth habeas application on September 22, 2014. The trial court forwarded all four applications to this Court, and we received them on April 20, 2015, and October 22, 2014. In this order, we will address only the initial application.

In his initial habeas application, applicant raises five grounds for relief challenging the validity of his conviction and sentence. In Allegation One (C), applicant alleges that trial counsel failed to conduct a constitutionally adequate investigation of mitigating evidence. Specifically, applicant states that trial counsel never identified and developed the lay and expert witnesses needed to give the jury a complete picture of applicant's life, although counsel presented cursory evidence that applicant suffered from poverty and abuse as a child through the testimony of applicant's younger sister, Sheila Armstrong. Applicant alleges that, if trial counsel had conducted an adequate mitigation investigation, counsel would have discovered that Applicant: grew up with abusive, neglectful parents, who spent any money the family had on alcohol; was so poor that he and his siblings often went hungry; lived in dangerous neighborhoods and was exposed to strangers coming and going from the house

---

[1] Unless otherwise indicated all references to Articles refer to the Code of Criminal Procedure.

where his parents sold alcohol "after hours"; witnessed extreme violence between his parents; was subjected to physical and sexual abuse; was subjected to his father's attempt to kill the whole family by burning down the house; and witnessed his father being shot in the doorway of their home.

Applicant also alleges that mental health experts who evaluated him post-conviction have determined that he suffers from dysthymia, substance dependence, personality disorder-not otherwise specified, and brain damage. They have also determined that applicant's history of an abusive home environment, failure and teasing in school, and experience as a juvenile in prison, led to applicant being traumatized, frightened, guarded, and at risk for responding to situations in a violent manner. They note that applicant's limited cognitive abilities and coping skills prevented him from responding well to stressful situations, and his reactions were those that his family had modeled for him. Applicant asserts that the jury heard no expert testimony at trial to explain how applicant's background affected his mental health and life choices.

Applicant has alleged facts that, if true, might entitle him to relief. *See Strickland v. Washington*, 466 U.S. 668 (1984). We apply a two-part test for determining whether a defendant has been constitutionally deprived of effective assistance of counsel: (1) deficient performance, and (2) prejudice. *See Ex parte Napper,* 322 S.W.3d 202, 246 (Tex. Crim. App. 2010) (citing *Strickland,* 466 U.S. at 687). Deficient performance means that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 246. When trial counsel does not conduct a

complete investigation, his conduct is "reasonable only to the extent that reasonable professional judgments support the limitations on investigation." *Id.* (quoting *Wiggins v. Smith,* 539 U.S. 510, 533 (2003)).

DEFICIENT PERFORMANCE

The evidence adduced in the motion for new trial proceedings and the habeas proceedings establishes deficient performance. Co-counsel for the defense, who was primarily responsible for the mitigation investigation, as well as the mitigation investigators who assisted her, consistently stated that they did not have time to complete the mitigation investigation before trial. Co-counsel stated that, based on a prior disagreement with lead counsel that resulted in the withdrawal of a motion for continuance she had filed in the trial court, she believed that: (1) she could not file a motion for continuance without the agreement of lead counsel; and (2) lead counsel would not agree to a continuance.

A mitigation investigator stated that she did not have time to travel to Alabama and Georgia, where applicant had lived until he moved to Texas less than five months before the instant offense. She stated that traveling to those states would have been important because applicant's family members lived in those states, and applicant's school, medical, mental health, juvenile, employment, and prison records were in those states. Further, traveling to those states would have been the best way to find anyone outside the family who might remember applicant, such as teachers, doctors, counselors, and supervisors.

The mitigation investigators' pretrial notes indicated that, based on their interviews with applicant, they wanted to know more about his immediate family members' mental

health and medical history. They also noted the need for a neuropsychological evaluation to assess applicant for brain damage, and for a psychiatric evaluation based on applicant's previous suicide attempts. However, the mitigation investigators did not obtain records concerning applicant's family members, and the specified mental health evaluations were not done. Co-counsel for the defense conceded that these failures were not the result of reasonable professional judgment. Thus, the record shows that trial counsel's mitigation investigation was deficient.

PREJUDICE

Establishing prejudice requires showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ex parte Napper,* 322 S.W.3d at 248 (quoting *Strickland,* 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* It is not enough that counsel's errors could have had "some conceivable effect on the outcome of the proceeding," but a defendant does not have to show that counsel's deficient conduct "more likely than not altered the outcome of the case." *Id.* at 248-49. In cases where trial counsel's failure to investigate and present evidence constituted deficient performance, we evaluate prejudice by considering the totality of the evidence, both that adduced at trial, and that adduced in the habeas proceedings. *See Ex parte Gonzales,* 204 S.W.3d 391, 398 (Tex. Crim. App. 2006).

During the punishment phase, the defense team presented the testimony of a pastor, David Ray, who had seen applicant and his girlfriend, Cynthia Losoya, at church in the

months before the offense. Ray testified that he knew applicant as a nice gentleman and a good person. Following applicant's arrest, Ray had visited applicant in jail twice a month. Applicant's girlfriend, Cynthia, testified that she was pregnant with applicant's child and that she loved him, although at the time of his arrest, she had been angry with him because he used cocaine and stayed out late after work.

Applicant's younger sister, Sheila Armstrong, testified that she and applicant had the same parents, and they had four older half-siblings who had a different father. The family moved so often that Sheila and applicant attended four different elementary schools. Their half-siblings treated them "differently," and they especially treated applicant "differently," because he resembled his father.

Sheila testified that applicant was close to his mother but not to his father, who was abusive. When Sheila and applicant were in fourth grade, their father would lock applicant in an empty room. Sheila would sneak food to him through the window. Sometimes Sheila and applicant would hide in the attic all day, waiting for their mother to come home. Their father would beat applicant with old train tracks, broom sticks, extension cords, or whatever he had, sometimes to the point that applicant bled. Their father also abused their mother, and on one occasion when he beat her, he knocked her eye out. Sheila testified that their father often took all of the family's money, so that they had to go to shelters and community centers for food. Sheila was not sure if their father had drug and alcohol problems. He raped Sheila when she was fourteen, and she became pregnant.

Sheila also testified that applicant was in special education classes in school. Sheila was younger than applicant, but she ended up being grades ahead of him because he failed several times. She recalled that applicant was seeing a psychiatrist and a counselor on a weekly basis until he went to "juvy." He went to counseling as a child because he was "slow" and exhibited some strange behaviors, such as shaving his eyebrows and plucking out his eyelashes.

Sheila also testified that, when applicant was 15 or 16 years old, he committed a robbery in Alabama, was tried as an adult, and was convicted and sentenced to ten years. Their mother died while applicant was in jail in Georgia. Applicant lived with Sheila in California after he got out of jail. He had a job in California, but he went with Sheila when she moved back to Alabama. He then moved to Georgia, where he lived with a woman who became pregnant. They lived together with the baby until applicant found her with another man and threatened them, which resulted in applicant's conviction for terroristic threat. Sheila testified that she heard that applicant had problems with alcohol and drugs, but she had not seen it. Applicant always had a job and worked.

During closing argument, defense counsel argued that applicant's childhood abuse, drug involvement, educational background, and juvenile history were mitigating circumstances. Counsel also focused on the fact that Cynthia was pregnant and that applicant had been working steadily since he moved to Texas. The defense argued that applicant could be a good father to his baby if he received a life sentence.

The State presented evidence of applicant's prior Alabama felony convictions for robbery, arson, and theft, as well as applicant's Georgia felony conviction for terroristic threat. The State argued in closing that, based on his past conduct, applicant was a future danger. Additionally, the State argued that the offense of conviction, in which applicant took a knife to the throat of someone he knew, was a close and personal attack that established applicant's future dangerousness.

The State noted that applicant had other children from past relationships, but having children had not stopped applicant from committing crimes in Alabama and Georgia, including one against his child's mother. Thus, the State argued, there was no reason to believe that applicant had changed just because he had a baby with Cynthia.

The State argued further that the defense had presented applicant's "sister who loves him, who claims that he was abused when he was a child, who claims that she was even more abused than he was. She supposedly has a child by a step-dad, and yet she never committed a single crime. . . ." The State noted that, even though applicant had regularly attended mental health counseling "since" he was twelve years old, he had not changed. It was not enough for applicant "to complain about something that happened when he was twelve years old," when he was not "interested in help." Others who grew up in unfortunate circumstances, like Sheila and the victim in this case, did not commit capital murder. Therefore, the State reasoned, applicant's background was not sufficiently mitigating.

Post-conviction, applicant has located additional family members whose potential testimony would have corroborated Sheila's testimony as well as added more details

concerning applicant's childhood and background. In addition, applicant has located some records of mental health counseling that he received as a child which indicate that, contrary to the State's trial argument that applicant had been in counseling every week "since" he was twelve years old, applicant attended counseling sporadically; they suggest that his mother stopped taking him when she decided that he did not need to go any more.

Applicant has also provided the reports of mental health experts indicating that he has a learning disability and brain damage, and diagnosing him with dysthymic disorder, alcohol dependence, cocaine dependence, and personality disorder-not otherwise specified, with characteristics of paranoid and borderline personality disorders. These experts opine that applicant's disabilities and disorders are the result of a number of environmental factors, including his family dysfunction, childhood trauma, and substance abuse during adolescence. One expert notes that the presence of scars on applicant's skull confirms that applicant suffered multiple head traumas, which is consistent with family members' accounts of the abuse he sustained as a child.

None of the witnesses who offered potentially mitigating evidence in the form of affidavits and expert reports testified at the live evidentiary hearing. Instead, the State "agreed to stipulate" to the admissibility of "a whole bunch of affidavits," "not necessarily the credibility and truthfulness of them, but that the witnesses, if they're brought forward," would "testify substantially the same as is reflected in those affidavits."

In its conclusions of law, the trial court describes applicant's post-conviction mitigating evidence as "largely cumulative" of Sheila's trial testimony, and concludes,

without elaboration, that this evidence "would not have affected the end result." We review these conclusions of law de novo. *See Ex parte Weinstein,* 421 S.W.3d 656, 664 (Tex. Crim. App. 2014).

We do not believe that the current record is sufficient to resolve the question of whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the punishment proceeding would have been different. Specifically, the post-conviction affidavits of applicant's family member witnesses contain evidence that would have been of some benefit to the defense, and all but one of these witnesses attest that they would have provided this information if they had been asked about it before trial. However, these witnesses do not expressly state that they would have been available to testify at trial. *See, e.g., Ex parte Ramirez,* 280 S.W.3d 848, 853 (Tex. Crim. App. 2007).

One witness who lives in Alabama informed the defense team before trial that she was not able to travel to Texas to testify. However, because all of the family member witnesses reside out of state, the defense team could have applied to take their depositions. *See* TEX. CODE CRIM. PROC. Ch. 39; *see also Frangias v. State,* 450 S.W.3d 125, 138-39 (Tex. Crim. App. 2013). The trial court has not made credibility findings concerning these witnesses' potential testimony, or findings as to whether these witnesses would have been available to testify at trial or to provide depositions.

Additionally, the post-conviction reports of applicant's mental health experts contain information that would have been of some benefit to the defense. One of applicant's experts opines that applicant's disorders arose in part from his family dysfunction and childhood

trauma. This evidence is similar to evidence that we have found to have mitigating value. *See, e.g., Ex parte Gonzales,* 204 S.W.3d at 399. The trial court has not made credibility findings or any other findings of fact specifically addressing these reports.

We remand this application for the trial court to gather information and make specific findings of fact concerning the credibility of applicant's post-conviction mitigating evidence. The trial court shall also make findings as to whether applicant's proffered witnesses would have been available to testify at trial or to give depositions. The trial court shall also make any other findings of fact and conclusions of law that it deems relevant and appropriate to the disposition of applicant's claim for habeas corpus relief.

This application will be held in abeyance until the trial court has resolved the fact issues. The issues shall be resolved within 90 days of this order. A supplemental transcript containing all affidavits and interrogatories or the transcription of the court reporter's notes from any hearing or deposition, along with the trial court's supplemental findings of fact and conclusions of law, shall be forwarded to this Court within 120 days of the date of this order. Any extensions of time shall be obtained from this Court.

IT IS SO ORDERED THIS THE 18TH DAY OF NOVEMBER, 2015.

Do Not Publish