John FRANGIAS, Appellant

v.

The STATE of Texas, Appellee.

No. 14–10–01090–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

Sept. 26, 2013.

George McCall Secrest, Jr., Houston, for Appellant.

Eric Kugler, Houston, for the State.

Panel consists of Justices BROWN, CHRISTOPHER, and McCALLY.

**OPINION ON REMAND**

TRACY CHRISTOPHER, Justice.

Appellant John Frangias's appeal of his conviction for sexual assault is before us on remand. He argues that the trial court abused its discretion in failing to grant his motion for new trial based on ineffective assistance of counsel. On original submission, we held that the record did not show that his attorneys' performance fell outside the broad range of prevailing professional norms. The Court of Criminal Appeals reversed, holding that "by any view of the evidence," counsel failed to render reasonable professional assistance. *Frangias v. State*, 392 S.W.3d 642, 652 (Tex.Crim.App. 2013). The Court of Criminal Appeals remanded the case for this court to determine whether appellant was prejudiced by counsel's deficient performance.

We conclude there is a reasonable probability that, but for his trial attorneys' failure to take the steps necessary to procure and introduce the deposition testimony of a crucial witness, the result of appellant's trial would have been different. We therefore reverse his conviction and remand the case to the trial court for further proceedings.

I. FACTUAL AND PROCEDURAL HISTORY

Appellant was convicted of sexually assaulting Canadian resident Kristi Honey in

July 2008 while she was a guest at appellant's family's hotel in downtown Houston. Honey checked into appellant's hotel on Monday, July 7, 2008, and during the three following days, appellant drove Honey and other guests to or from the venue where they were attending a convention. Honey checked out on Friday, July 11, 2008 and returned home. That evening, she reported to Canadian authorities that appellant had raped her.

Beyond this, appellant's version of events differs sharply from that of the State.

## A. The Complainant's Version of Events

According to Honey, appellant dropped her off at a convention event on the evening of Thursday, July 10, 2008. She had two glasses of wine at the event and a third at her business partner's hotel room. She returned to appellant's hotel at 11:00 p.m. There was no one in the lobby when she entered and started up the stairs to her room, but when she was nearly to the second floor, she saw appellant downstairs speaking to someone. He then excused himself and started up the stairs behind her. Honey quickened her pace, but appellant did the same, and when she opened her door with her key, appellant pushed her into the room. Honey initially laughed and told appellant that she was married and that he had to leave, but appellant grabbed her and kissed her. Appellant pulled her hair as he fondled her breasts and genitals, but she was able to push him away enough to see that the door to her room was still open. When appellant saw her look in that direction, he pushed the door closed. He unbuttoned and unzipped her jeans, which fell to her knees, and when she tried to pull her jeans back up, appellant pushed her back onto the bed. Honey closed her eyes and put her hands over her face, and appellant removed her jeans and underwear and had vaginal intercourse with her. Honey continued to cover her face while appellant first went into the bathroom then dressed and left without speaking to her again.

After appellant left, Honey discovered that the door to her room could not be bolted from the inside. She showered and brushed her teeth, but decided not to call the police because she hadn't screamed or fought back. She telephoned her husband at 11:24 p.m., and spoke with him for about half an hour but did not tell him what had occurred. She checked her email and called a business associate at around midnight. She spoke with him for about a half-hour, and again, did not mention the assault.

Honey left the hotel shortly after 7:00 a.m. the next day and took a cab to her business partner's hotel. The two of them went to the airport, where they had breakfast together and talked about employee benefits. After her business partner's flight departed, Honey emailed a friend that she had been raped. Honey then flew back to Canada, and upon her arrival, she left a telephone message for another friend who was a former police officer. When the former police officer returned her call, Honey described what had happened to her, and the officer told Honey to collect the clothes that she had been wearing at the time and report the assault. Honey's husband heard her crying while she was talking on the phone, and went to investigate. Honey told him what had happened, and he took her to the police station to report the offense.

Honey had a medical examination at about 9:00 p.m. that night. During the examination, Honey reported that the assault occurred after midnight and that she had four glasses of wine between 6 p.m. and midnight on that day. The nurse

examiner later testified that her facility encourages rape victims to have a supportive person present during the examination, but Honey's husband remained in the interview room rather than accompanying her. Honey gave the examiner a pair of underwear but stated that they were not the same pair that she had been wearing at the time of the assault. The examiner found no physical evidence of assault.

## B. Appellant's Version of Events

In his defense, appellant attempted to show that (1) he was physically incapable of forcible rape; (2) when Honey returned to the hotel on July 10, 2008, she was so intoxicated that she was confused, irrational, emotional, and unable even to stand up unassisted; and (3) appellant helped the intoxicated Honey upstairs and delivered towels that she requested, but did not enter her room.

Through an interpreter, appellant's wife Maria testified that appellant has had substantial problems with kidney stones for the past three or four years. He first had surgery for the problem in 2007, and by the time of the trial in October 2010, he had seven subsequent procedures to dissolve the stones. Appellant's medical records showed that he had a ureteral stent inserted in 2007, and his wife testified that since February or March of 2008, when appellant had a medical device called a "pigtail" inserted, appellant has found erections to be very painful.[1] Appellant also testified that due to the pain from his kidney problems, he could not have an erection.

On the evening of July 10, 2008, registered nurse Mindy Colson was in the hotel lobby until after midnight, waiting for a room to become available.[2] Colson testified that appellant appeared sweaty, "somewhat hobbled," and in pain. At around midnight, Colson saw appellant discover a woman lying on her stomach in front of the hotel's entrance. The woman had a large build, was dressed in jeans and a T-shirt, appeared to be in her early 30's, and smelled of alcohol. When appellant turned the woman over, the woman awoke and seemed disoriented. She began crying and then screaming. When appellant began trying to help the woman up, Colson saw the woman grab him and try to kiss him. Appellant freed himself, and the woman staggered into a wall. Colson saw appellant and another man help the woman up the stairs, and appellant came back to the lobby approximately five minutes later. He then took towels upstairs and returned within a couple of minutes.

Appellant testified that on the second day of Honey's stay, he drove her and another guest to the convention center. Honey smelled of alcohol when he picked her up at noon and when he drove her to the convention center the next day. When she called him for a ride back to the hotel, he refused because he was in pain. That evening, appellant and Honey argued about the room rate and his failure to pick her up from the convention center. When he drove Honey and another woman to the convention center the next morning, Honey again smelled strongly of alcohol and appeared to be intoxicated. Honey was rude to appellant and asked him questions that upset him, so he loudly told her not to come back.

---

1. Appellant stated that this procedure took place during a hospitalization in Greece on May 19–21, 2008, less than two months before the alleged assault.

2. From the transcript, it is not clear when Colson arrived at the hotel. She stated that it was "probably around 1ish," and defense counsel asked, "1:50 p.m.?" Colson replied, "Yes, at night 2200."

Appellant testified that he next saw Honey at about midnight or 12:30 a.m. as she lay on the ground outside of the hotel. He slapped her face and opened her eyes to see if she was still alive and tried to help her stand up. Honey held onto him and to the door handle to pull herself up, but when she continued to hold him and push him, he pushed her away. Honey alternately cried, laughed, and sang. She tried to go upstairs, but she fell twice, so appellant and part-time maintenance worker Jay Sotomayor helped her upstairs. They followed Honey as she staggered to her room. When it appeared that she had no key, appellant opened Honey's door and she fell to the floor. When asked at trial to describe what happened next, appellant answered, "Just crack the door, and I help come in, get up, and I let her to go to her room, and I leave." [3] Appellant then went to the room of long-term resident Ron Hansard, who asked for a USB drive. While appellant was downstairs getting one, Honey called for more towels. Appellant brought her the towels, then went to Hansard's room. Appellant next saw Honey at about 10:40 a.m. She had planned to stay another night, but appellant insisted that she leave.

To impeach appellant's testimony, the State offered evidence that six months before the alleged assault, appellant complained of erectile dysfunction and his doctor prescribed Viagra; however, this would have been before appellant underwent the medical procedure that caused erections to be painful.

## C. The Motion for New Trial

After a jury convicted appellant and assessed punishment at eight years' confinement in the institutional division of the Texas Department of Criminal Justice, appellant hired attorney David Cunningham and filed a motion for new trial based on ineffective assistance of his trial counsel, lead attorney Lisa Jones and her co-counsel Alfred "Bud" Valdez. Through his new counsel, appellant argued that hotel employee Jay Sotomayor was present on the night of the alleged assault and would have corroborated his version of events. More than three months before the trial, Sotomayor had prepared and signed a notarized statement in which he stated that (1) he saw Honey lying on the ground outside the hotel; (2) when appellant helped Honey up, she screamed and cried, slurred her speech, and fell repeatedly; (3) he accompanied appellant when appellant assisted Honey upstairs; (4) appellant did not enter Honey's room; and (5) after appellant helped Honey to her room, she called for more towels, and once again Sotomayor accompanied appellant upstairs and saw that appellant did not enter Honey's room. Appellant's new attorney also attested that Sotomayor's statement was in the file he received from appellant's trial counsel, and the face of the statement shows that it was notarized on July 14, 2010, more than three months before appellant's trial. Paralegal Irene Alexander attested that she assisted appellant's "defense team" when appellant was represented solely by Valdez and that she was aware of the general nature of Sotomayor's testimony at that time, but that when appellant retained Jones, Jones told Alexander that the paralegal's services were not needed.

Appellant attested that when he first retained Jones, he told her that Sotomayor had been present at the time of the alleged assault and could confirm that he never entered Honey's room. Appellant further

---

**3.** We quote this statement because it is ambiguous, and different listeners could have different impressions as to whether this statement meant that appellant did or did not enter the room.

attested that he told Jones in July 2010 that Sotomayor was in Houston, and Jones told him to "get a statement from him and to be sure it was notarized." Appellant stated that he then gave the original or copies of the notarized statement to both Jones and Valdez in July 2010.

Finally, Alexander attested that she was asked to rejoin the defense team about a week before the trial. She spoke to Sotomayor for the first time on October 22, 2010 and learned that he was willing to travel to Houston to testify at appellant's trial, but he was undergoing chemotherapy in El Paso. Alexander further attested that Sotomayor told her on October 25, 2010— the first day of the trial—that his doctor would not permit him to travel.

The State did not file a response to appellant's motion for new trial. Although the State filed in the clerk's office a "stand-alone" affidavit by Jones and offered the affidavit as evidence at the hearing on the motion for new trial, the trial court never stated that the affidavit was admitted, and the State never asked for a ruling or objected to the failure to rule on the offer.[4] The State also asked the trial court to sign its proposed order directing Valdez to file an affidavit with the clerk of the court within ten days, and the trial court did so. The order required the clerk of the trial court to notify counsel when the affidavit was received, but did not require the hearing on the motion for new trial to be reconvened or otherwise address the requirements for the affidavit to be admitted into evidence. Valdez timely filed an affidavit in which he attested that his answers to ten questions were "true and correct to the best of my knowledge."

The hearing on the motion for new trial was not reconvened, and the motion was

overruled by operation of law. On appeal, we held that the record did not show that trial counsel's assistance fell below prevailing professional norms. The Court of Criminal Appeals reversed that holding and remanded the case.

## II. Issues Presented

In four issues, appellant contends that the trial court erred in failing to grant his motion for new trial where his state and federal constitutional rights to effective assistance of counsel were violated by his trial attorneys' failure (a) to procure the testimony of Jay Sotomayor, whether live or by deposition; or (b) to properly move for a continuance in order to procure Sotomayor's testimony.

## III. Standard of Review

We review claims of ineffective assistance of counsel under the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This test applies to claims arising under the state as well as the federal constitution. *Hernandez v. State*, 726 S.W.2d 53, 56–57 (Tex.Crim. App.1986). Under the *Strickland* test, an appellant must prove that his trial counsel's representation was deficient and the deficient performance was so serious that it deprived the appellant of a fair trial. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

To establish the first prong, the appellant must prove by a preponderance of the evidence that counsel's representation fell below the objective standard of prevailing professional norms. *Id.*, 466 U.S. at 687–88, 104 S.Ct. at 2064–65. Because the Court of Criminal Appeals has determined

---

4. *See Frangias,* 392 S.W.3d at 649 (noting that the trial court did not "formally accept Jones's affidavit into evidence"); *id.* at 650 ("[T]he trial court never explicitly admitted Jones's affidavit into evidence ....").

that trial counsel's performance in this case was deficient, we now focus exclusively on the prejudice prong of the *Strickland* test.

Ineffective assistance of counsel prejudices a criminal defendant if there is a reasonable probability that, but for counsel's deficiency, the result of the proceeding would have been different. *Id.,* 466 U.S. at 694, 104 S.Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.; Cox v. State,* 389 S.W.3d 817, 819 (Tex.Crim.App.2012). In determining whether an appellant has been prejudiced by counsel's deficient performance, the court "must consider the totality of the evidence before the judge or jury." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.,* 466 U.S. at 696, 104 S.Ct. at 2069.

■ Here, appellant raised his allegations, of ineffective assistance of counsel through a motion for new trial. We may not reverse the trial court's denial of a motion for new trial absent an abuse of discretion. *Charles v. State,* 146 S.W.3d 204, 208 (Tex.Crim.App.2004), *superseded in part on other grounds by* Tex.R.App. P. 21.8(b), *as recognized in State v. Herndon,* 215 S.W.3d 901, 905 n. 5 (Tex.Crim.App. 2007). We therefore must determine whether the trial court abused its discretion in "allow[ing] the motion for new trial to be denied by operation of law on the ground that the appellant failed to satisfy the prejudice prong of *Strickland.*" *Frangias,* 392 S.W.3d at 660. A trial court abuses its discretion if it acts without reference to any guiding principles or in an arbitrary or unreasonable manner. *See Charles,* 146 S.W.3d at 208. To determine whether the trial court abused its discre-

tion, we view the evidence in the light most favorable to the trial court's ruling, and defer to its credibility determinations. *Id.* Because we presume that the trial court implicitly made all reasonable factual findings that could have been made in support of its ruling, we will conclude that the trial court abused its discretion only if no reasonable view of the record could support its ruling. *Id.* This remains true even if we would have decided the issue differently. *Herndon,* 215 S.W.3d at 907–08.

## IV. ANALYSIS

■ The dispositive question before us is whether the trial court abused its discretion in failing to conclude that appellant was prejudiced by his trial counsel's deficiencies; that is, in failing to conclude there was a reasonable probability that the outcome of the case would have been different if appellant's counsel had taken the steps necessary to (a) procure Sotomayor's testimony, whether live or through a deposition, or (b) obtain a continuance. Because prejudice from ineffective assistance of counsel must be determined based on "the totality of the evidence before the judge or jury," *see Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069, we begin by addressing unsettled questions about the post-sentencing evidence considered by the trial court in allowing appellant's motion for new trial to be overruled.

### A. The post-sentencing evidence includes the notarized statement of Jay Sotomayor and the affidavits of appellant, Alexander, and Cunningham, but does not include the affidavits of Jones or Valdez.

There is no remaining dispute about the evidence that was admitted at trial, but the record is less clear concerning evidence that was offered or created after appellant was convicted and sentenced.

### 1. All of appellant's post-sentencing evidence was admitted into evidence.

The reporter's record revealed that mistakes were made either in admitting or identifying evidence at the hearing on appellant's motion for new trial, but we could not always tell which type of error occurred. Appellant's post-conviction counsel offered and the trial court admitted as "Defendant's Exhibit A" and "Defendant's Exhibit B" documents that were represented to be the same as those that were attached to the new-trial motion as "Defendant's Exhibit A" and "Defendant's Exhibit B"; however, the documents in the reporter's record differ from those attached to the motion for new trial. According to the transcript of counsel's arguments, "Defendant's Exhibit A" should have been a notarized statement by Jay Sotomayor, but the corresponding document in the reporter's record is a string of emails in which Sotomayor is not mentioned. "Defendant's Exhibit B" should have consisted solely of the affidavit of Irene Alexander, but in the corresponding document in the reporter's record, an additional page contains an email exchange that was actually an exhibit to Jones's affidavit. It therefore was not possible for us to determine solely from the record whether the court reporter had attached the wrong material, or whether appellant's counsel had tendered the wrong exhibits.

On our own motion, we asked the parties to clarify whether they contended that the reporter's record was inaccurate. In responsive letter briefs, the parties agreed that the exhibits in the reporter's record are inaccurate in that "Defendant's Exhibit A" and "Defendant's Exhibit B" that were offered and admitted at the hearing on the motion for new trial were in fact the same "Defendant's Exhibit A" and "Defendant's Exhibit B" that were attached to appellant's motion for new trial. We therefore treat these attachments to the motion for new trial as those exhibits. *See* Tex.R.App. P. 34.6(e)(1) ("The parties may agree to correct an inaccuracy in the reporter's record, including an exhibit, without the court reporter's recertification.").[5]

### 2. The affidavits of appellant's trial attorneys were neither admitted into evidence nor treated as admitted by the trial court.

■■ The parties disagree about the status of the affidavits of trial attorneys Jones and Valdez, which were filed with the clerk of the court but never formally admitted. Materials filed in the clerk's office in connection with a motion for new trial are not part of the substantive evidence unless accepted into evidence by the trial court at a hearing. *See Rouse v. State*, 300 S.W.3d 754, 761–62 (Tex.Crim. App.2009) (holding that appellate court erred in relying on trial counsel's admissions in a post-conviction motion that the appellant's plea was involuntary where the motion was not introduced into evidence at a hearing); *McIntire v. State,* 698 S.W.2d 652, 658 (Tex.Crim.App.1985) (explaining that an affidavit that is simply filed in the clerk's office is not admitted into evidence).[6] The State offered Jones's

5. At the hearing, appellant's post-conviction counsel also offered affidavits from himself and from appellant. These were admitted into evidence and correctly identified in the reporter's record.

6. The Third Court of Appeals recently expressed uncertainty about the circumstances under which the holdings of *Rouse* and similar cases would preclude appellate review of exhibits attached to a motion for new trial. *See Davis v. State*, No. 03–11–00450–CR, 413 S.W.3d 816, 829–30, 2013 WL 4816921, at *11 (Tex.App.-Austin Aug. 30, 2013, no pet. h.). In that case, the trial court denied the movant's request for a hearing on the motion but explicitly ruled on the motion and issued

affidavit as evidence at the hearing on appellant's motion for new trial, but the reporter's record shows that the trial court never ruled on the offer and that the State did not except to the trial court's failure to rule. As for Valdez's affidavit, it is undisputed that it was created after the hearing on the motion for new trial, and because the hearing was never reconvened, that affidavit was never offered into evidence at all. The parties do not contend that the reporter's record is inaccurate in failing to indicate that this material was admitted into evidence.

■ The State asserts that we nevertheless should treat these affidavits as admitted because the parties have done so on appeal. Although we agree that both parties at times have treated the Jones and Valdez affidavits as admitted by the trial court, appellant has not done so consistently. *See Frangias*, 392 S.W.3d at 651 (noting that in appellant's statement of facts, he "pointed out that the trial court never explicitly admitted the affidavits of Jones and Valdez" and treating this as "suggesting that for this reason [the affidavits] do not constitute competent evidence for purposes of appellate review"). Appellant does not concede that the trial court admitted or considered the Jones and Valdez affidavits. Indeed, the Court of Criminal Appeals described the parties as presenting "competing contentions with regard to the evidentiary status" of the affidavits. *Id.* at 660–61.

The State also contends that "when the clerk's record contains a document considered as evidence by the trial court, the appellate courts will treat it as such despite the lack of formal admission into evidence"; however, the record in this case does not show that the trial court considered Jones's or Valdez's affidavit. *Cf. Ex parte Reagan*, 549 S.W.2d 204, 205 (Tex. Crim.App.1977) (affirming order remanding appellant for extradition even though warrant and supporting papers were not introduced or admitted into evidence because "[i]t is clear . . . that [this evidence] was before the trial court *and was considered by him* prior to entry of his order") (emphasis added).

As for the Jones affidavit, the record shows that the State gave a copy to the trial court but does not show that the trial court considered it. The record does not establish that the trial court read it or that anyone else read any portion of the affidavit aloud or discussed its contents in the trial court's presence. *Cf. Heberling v. State*, 834 S.W.2d 350, 356 & n. 6 (Tex. Crim.App.1992) (treating cocaine as admitted into evidence where counsel showed it to the jury and elicited testimony about it without objection); *Huff v. State*, 576 S.W.2d 645, 647–48 (Tex.Crim.App.1979) (explaining that allowing testimony to be read from a document is tantamount to introducing the document itself). And unlike the trial courts in the cases on which the State relies, the trial court here did not explicitly rule on the matter to which this evidence pertained. *Cf. Richardson v. State*, 475 S.W.2d 932, 933 (Tex.Crim.App. 1972) (treating exhibits as admitted where the record showed that "the judge asked if he could read the exhibits instead of having them presented or read by the State";

findings. *Id.* In light of its uncertainty about the scope of review, the appellate court reviewed the record twice, first excluding and then including the new-trial motion and its attachments. The facts of this case are unlike those of *Davis*. Here, the trial court did conduct a hearing at which evidence was offered

and admitted, then allowed the motion to be overruled by operation of law. We therefore do not address the question of whether a trial court's findings and express ruling on a motion for new trial are sufficient to establish that it treated exhibits attached to the motion as admitted evidence.

"counsel for the appellant agreed"; exhibits "sufficient to prove appellant's guilt . . . were presented to the judge"; and "the judge announced that the evidence was sufficient to support the conviction").

The record concerning the Valdez affidavit is sparser still. There is no suggestion in the record that the trial court ever saw this material. The trial court ordered Valdez to make and file such an affidavit, and ordered the clerk of the court to notify counsel when the affidavit was received. But no one was ordered to notify the trial court that the affidavit had been filed, to present the affidavit to the trial court, to offer it into evidence, or to seek to reconvene the hearing on the motion for new trial—and nothing in the record indicates that the parties did any of these things on their own initiative. ·

■ The State additionally maintains that we should consider the Jones and Valdez affidavits simply because they were filed in the clerk's office before the motion for new trial was overruled. As support for this position, the State relies on a 1906 case in which an appellant complained that the day before the trial court overruled his motion for new trial, the State filed a controverting affidavit without notice to him. *See Lara v. State*, 50 Tex.Crim. 163, 95 S.W. 1083 (Tex.Crim.App.1906). The court in that case held that the absence of notice was immaterial in light of the then-existing rebuttable presumption that a defendant was present when his motion for new trial was overruled, and could have responded to the State's affidavit at that time. *Id.*, 50 Tex.Crim. at 164, 95 S.W. at 1084. The case has no application here. A motion for new trial now can be—and in this case, actually was—overruled by operation of law outside of the movant's presence. *See* Tex.R.App. P. 21.8. And the question before us is not whether appellant

received adequate notice that the State filed the affidavits of Jones and Valdez in the clerk's office, but whether the trial court ever considered them. The record does not show that it did.

The State also asserts that "the trial court implied that it would make a ruling on the motion for new trial after obtaining Valdez's affidavit," but the record does not show that the trial court obtained the affidavit or stated that it would consider an affidavit that was not offered and admitted into evidence. When the trial court stated that it would order Valdez "to give a statement," appellant's post-conviction counsel asked, "And then I guess we'll continue the hearing once we get his affidavit?" The trial court responded by asking the date of the deadline to rule on the motion. The trial court and the attorneys then had a discussion off the record. The record resumes with the trial court's statement, *"Get those to me.* I'll make a determination and give you a ruling." (emphasis added). This statement did not eliminate the need to reconvene the hearing, as can be seen by the trial court's last statement on the record: "The case will be *recessed.*" (emphasis added). A hearing that is "recessed" is not over, but is temporarily halted. *See* Webster's New World College Dictionary 1120 (3d ed. 1996) (defining "recess" as "to halt temporarily [to *recess* a hearing]").

Finally, the State relies on a case in which the trial court took judicial notice of a competency report that was not admitted into evidence, perhaps implying that the trial court took judicial notice of the Jones and Valdez affidavits. *Cf. Fuller v. State*, 30 S.W.3d 441, 445 (Tex.App.-Texarkana 2000, pet. ref'd). Here, however, the record does not show that the trial court was asked to take judicial notice of the trial

attorneys' affidavits or that it did so.[7]

In sum, the record does not show that the Jones and Valdez affidavits were admitted into evidence or considered by the trial court; thus, we do not include them within the scope of our review.

**B. Appellant was prejudiced by his trial attorneys' failure to attempt to procure and admit Sotomayor's deposition testimony.**

██ Although the prejudice component of an ineffective-assistance-of-counsel claim is set forth in *Strickland* and the cases applying it, the parties have not cited, and we have not found, a case analyzing prejudice arising from the failure to follow the steps necessary to procure and admit deposition testimony. The situation is analogous, however, to the failure to call particular witnesses, which "is irrelevant absent a showing that such witnesses were available and appellant would benefit from their testimony." *Perez v. State*, 310 S.W.3d 890, 894 & n. 54 (Tex.Crim.App. 2010) (quoting *King v. State*, 649 S.W.2d 42, 44 (Tex.Crim.App.1983)). Both were shown here.

██ The record shows that Sotomayor was available to testify via deposition. Alexander attested that Sotomayor was willing to testify but was undergoing chemotherapy at the Veteran's Administration Hospital in El Paso at the time of trial. Although she attested that Sotomayor's doctor would not permit him to travel, it is appropriate for a trial court to permit the deposition of a witness who has information critical to a significant factor at trial or who has exclusive possession of certain information. *Frangias*, 392 S.W.3d at 655–56.[8] Sotomayor was "a critical witness," *id.* at 655 n. 32, and deposing him would serve "to preserve critical testimony that might otherwise be lost." *Id.* at 657. Although the Court of Criminal Appeals relied in part on his trial attorneys' affidavits in reaching these conclusions and we do not consider this material, the critical nature of Sotomayor's anticipated testimony can be seen without relying on these affidavits by comparing the State's version of events with that of appellant.

According to Honey, she had dinner with her business partner at his hotel, and left at nearly 11:00 p.m. She testified that she made a cell-phone call at 10:57 p.m. while en route to appellant's hotel. She stated that she opened the door to the hotel lobby with her key, and when she went upstairs, she heard appellant following her. She testified that when she unlocked her door, appellant placed his arms on either side of her and pushed her door open.[9] He then kissed her, fondled her,

---

7. We therefore do not address the suggestion that statements made in judicially noticed affidavits are properly treated as substantive evidence.

8. To meet the requirements for deposing Sotomayor, appellant would have had to "personally file an affidavit along with his application to depose" the witness. *Frangias*, 392 S.W.3d at 655 & n. 34 (citing Tex.Code Crim. Proc. Ann. arts. 39.02 & 39.12). Here, the Court of Criminal Appeals determined that the trial attorneys' failure to obtain these materials was the result of their deficient performance. *Id.* at 655.

9. Honey spoke with her friend Stephanie Jones (unrelated to trial counsel Lisa Jones) the day after the alleged assault, and when Stephanie Jones spoke with a Houston detective a year later, she stated that Honey told her that appellant had knocked on the door. At trial, however, the witness also said that her recollection of what Honey said was "very blotchy." She further admitted that when she spoke again with Honey about these events, Honey denied saying that appellant had knocked on the door. Stephanie Jones stated that she had "vague memories" of being sexually assaulted as a child, and when asked if she was sure that Honey said appel-

pushed her on the bed, removed her jeans and underwear, and sexually assaulted her. She stated that after appellant left, she brushed her teeth, showered, brushed her teeth again, took some Tylenol, booted up her laptop, looked at the website for the Houston Police Department, looked at the website for the Ontario police, "googled" the name of the hotel to see if there were reports of other sexual assaults, wrote down everything that had happened (an account that covered both sides of six sheets of notepad paper), destroyed the paper, and then called her husband at 11:24 p.m. Honey admitted that she initially had stated that the assault took place after midnight, but arrived at the times noted above after looking at her cell-phone records. Thus, Honey contends that all of these events—including the assault—took place within a twenty-seven minute window of time immediately after she arrived back at appellant's hotel on the night of July 10, 2008.

According to appellant's version of events, he drove Honey and another hotel guest to the convention center that day, and when he next saw her, she was lying drunk on the ground outside the hotel at around midnight or 12:30 that night. He stated that he and Sotomayor helped Honey upstairs to her room, where he opened the door for Honey. His description of the way Honey entered the room is unclear, but appellant did not state that he entered the room, and his testimony could have been understood to mean that he did not enter the room. Appellant said that when he was downstairs getting the USB drive that Hansard requested, Honey called and asked for towels. He picked up the towels and went upstairs. He testified that when he got to Honey's room, "I knock the door. She open her hand, I give her the towels; and I come immediately to [Hansard's room] ...." Mindy Colson corroborated appellant's testimony that he found a drunken woman outside the hotel and that he and another man helped the woman upstairs. She also testified that he took towels upstairs and that he was "up and back fast, a couple minutes."

Sotomayor's testimony would have benefitted appellant because Sotomayor—and *only* Sotomayor—could corroborate that the drunken woman found lying outside the hotel on the night of July 10th was Kristi Honey, and that although appellant assisted her upstairs and delivered towels to her room, he did not enter.[10] *Cf. Butler v. State,* 716 S.W.2d 48, 56 (Tex.Crim. App.1986) (holding that where no physical evidence linked appellant to robbery and conviction was based solely on the identification testimony of the complainant, counsel's failure to investigate was prejudicial where two witnesses would have testified that appellant was not the robber and a third witness would have provided an alibi); *In re I.R.,* 124 S.W.3d 294, 300 (Tex. App.-El Paso 2003, no pet.) (concluding that defendant whose testimony raised the defense of alibi was prejudiced by trial counsel's deficient performance in failing to subpoena a known witness who would have corroborated his testimony); *State v. Thomas,* 768 S.W.2d 335, 337 (Tex.App.-Houston [14th Dist.] 1989, no pet.) (holding that defendant accused of sexual assault and who admitted having sex with the complainant was prejudiced by trial counsel's deficient performance in failing

---

lant knocked on the door, the witness said, "I have a vivid memory of someone knocking on the door. But, guess what, I remember that as a kid, too. So, it's really hard for me to differentiate if that's my memory ...."

**10.** *See Frangias,* 392 S.W.3d at 645 ("[Colson] was not asked, however, and evidently could not definitively say, whether the woman she saw was Honey.").

to call witnesses who would have corroborated his defense of consent).

Prejudice from the trial attorneys' error is likely because the verdict is only weakly supported by the record. There is no physical evidence that appellant committed sexual assault; in fact, there is no physical evidence that an assault occurred at all. Because appellant's conviction was dependent on the complainant's credibility, his trial attorneys' failure to take the steps necessary to procure and admit Sotomayor's crucial controverting testimony "had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture ...." *See Strickland,* 466 U.S. at 695–96, 104 S.Ct. at 2069. Colson testified that another man accompanied appellant when he assisted a drunken woman upstairs, and appellant identified the woman as Honey and the other man as Sotomayor, but trial counsel's failure to follow the procedures for procuring and admitting Sotomayor's deposition testimony left the jury to infer that the missing witness would not have supported appellant's version of events. In fact, the opposite is true. Sotomayor—the only other eyewitness to the interaction between Honey and appellant on the second floor of the hotel—would have corroborated the most important points of appellant's version of events and contradicted Honey's version.

■ We conclude there is a reasonable probability that, absent the trial attorneys' deficient performance in failing to take the statutorily authorized steps to procure and admit Sotomayor's testimony by deposition, the jury would have had a reasonable doubt as to his guilt. *See id.,* 466 U.S. at 695, 104 S.Ct. at 2068–69. We therefore sustain appellant's first two issues, and in light of this disposition, we do not reach his two remaining issues.

## V. CONCLUSION

Because appellant was prejudiced by his trial attorneys' ineffective assistance in failing to take the steps necessary to procure and admit the testimony of a crucial witness, we reverse his conviction and remand the case for further proceedings.