

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00117-CR

———————————————

TRACE MOFFATT, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 462nd District Court
Denton County, Texas
Trial Court No. F19-2894-16

Before Sudderth, C.J.; Kerr and Bassel, JJ.
Memorandum Opinion by Justice Bassel

**MEMORANDUM OPINION**

Trace Moffatt was convicted of aggravated sexual assault and two counts of indecency with a child after a jury trial that occurred thirteen years after the offenses' alleged commission dates and on an indictment that was not issued until nine years after the alleged commission dates and the then-seven-year-old complainant's outcry. By the time of trial, the complainant—who testified unequivocally about what Moffatt had done to her—was an adult. The primary defensive theory was that in 2010—the year of the alleged offenses—the child complainant had been coached to make her outcry so that her mother could gain custody leverage in a divorce proceeding. To that end, defense counsel sought to discredit the complainant's outcry based on the circumstances existing at that time—including the vagueness of her 2010 interview and inconsistencies between her 2010 and 2013 interviews—and in light of the subsequent law-enforcement delay in investigating the offenses and charging Moffatt. Nevertheless, after convicting Moffatt, the jury assessed the maximum punishment of confinement for each offense: life for the aggravated sexual assault and twenty years for each of the indecency offenses.

In two issues on appeal, Moffatt contends (1) that his trial counsel was ineffective in numerous ways—but primarily by successfully proffering recordings of both of the complainant's forensic interviews, made when she was seven and ten, respectively—and that he was prejudiced by his attorneys' deficient performance, and (2) that the trial court erred by determining that "noise/sound/hearing issues in [the]

2

courtroom" did not result in omissions from, or inaccuracies in, the reporter's record. Because we conclude that he is not entitled to relief for either of his complaints, we affirm.

**Background**

In 2019, Moffatt was indicted for aggravated sexual assault of a child and two counts of indecency with a child for offenses alleged to have occurred in January and February 2010; the case was tried to a jury in 2023. The complainant testified that Moffatt "molested [her] when [she] was a child," touching and digitally penetrating her "vagina[l] area" and touching her prepubescent chest while lying behind her with "his arm around [her] neck." Although the complainant was able to give quite detailed testimony about the offenses and her outcry, she could not remember as much detail about what happened after she made her outcry. For instance, although the complainant could remember that when she was seven, and the nurse practitioner tried to touch her leg at a checkup, she "yelled . . . don't touch me. Don't touch me . . . there. [Moffatt] touched me there," the complainant said of the subsequent investigation and forensic interviews only that she "had to talk to" several people, including a "lady . . . [with] long hair" and a camera. According to the complainant, when she was younger, she "didn't know the words . . . to explain" what Moffatt had done to her, but after going through therapy, she "started to understand how to tell people what had happened."

The State's witnesses included the complainant's mother (Mother), whom the defense vigorously cross-examined about the circumstances of her marriage and divorce, the complainant's outcry, and the subsequent investigation; the nurse practitioner whose 2010 examination prompted the then-seven-year-old complainant's outcry; a SANE[1] who, also in 2010, examined the complainant for signs of sexual abuse; the forensic interviewer who interviewed the complainant in 2010 and 2013; the Denton County Sheriff's investigator who took over the stalled investigation in 2019; and a second victim, who testified that when she was fifteen and traveling to horse shows with Moffatt and others, he had twice sexually assaulted her in much the same way—while in bed, holding her from behind so that she could not move.[2]

Moffatt testified on his own behalf and also called several witnesses, including a forensic psychologist, who testified as an expert on memory and lack of generation boundaries—a child's knowing age-inappropriate details about the adults around her in a way that indicates an adult has given the information to that child. The forensic psychologist viewed the complainant's two interviews outside the jury's presence and then testified that in the 2013 video (when the complainant was ten) the

---

[1]The acronym SANE refers to either a sexual-assault nurse examiner or sexual-assault nurse examination, depending on the context. *Pierson v. State*, Nos. 02-23-00226-CR, 02-23-00227-CR, 2024 WL 3195093, at *1 n.6 (Tex. App.—Fort Worth June 27, 2024, no pet. h.) (mem. op., not designated for publication).

[2]The defense was able to elicit testimony that these events happened in 2001, and Mother found out about them in 2006, before the complainant's 2010 outcry in this case.

complainant's describing Moffatt as "creepy and a drunk and having affairs with other women" was not "information [that] is helpful to ten-year-olds." He also agreed that when the complainant was asked in the same interview why she had to come back for another one, she said she needed to make another "outcry" because "her case had been canceled" and that she knew that, at that time, another victim had come forward. The psychologist testified that an adult's disclosing those additional allegations to a ten-year-old would be inappropriate. He also opined on the effect adults can have on children's understanding and recall:

> [C]hildren are very suggestible. And when adults tell them things, over time, especially if these allegations are repeated, children will begin to adopt what they have been told as their own memory.
>
> We have a fancy term for it. I'll explain if you wish. But basically we are all vulnerable to this. Children, more so. When we hear things from other people, we tend, over time, not to remember where that information came from but, nonetheless, adopt it as our own memory.

The forensic psychologist offered an explanation to the jury of how the now-adult complainant could be believable at trial, but nevertheless give unreliable testimony, and also explained why her initial outcry showed signs of being coached. And his assessment of the complainant's statements and demeanor in the interviews was critical to making that point.

Despite the defensive theory's being clear from the record, Moffatt argues on appeal that no competent trial counsel would have performed as his trial counsel did,

focusing in particular on the admission of and reliance on the forensic interviews. Thus, we will address that complaint first.

## Ineffective Assistance Complaint

In his first issue, Moffatt contends that his defense counsel—which the trial judge noted on the record consisted of "three . . . sometimes four" attorneys—were ineffective.

### A.  Standard of Review and Applicable Law

To establish ineffective assistance, an appellant must prove by a preponderance of the evidence that his counsel's representation was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013). The record must affirmatively demonstrate that the claim has merit. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

In evaluating counsel's effectiveness under the deficient-performance prong, we review the totality of the representation and the particular circumstances of the case to determine whether counsel provided reasonable assistance under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307; *Thompson*, 9 S.W.3d at 813–14. Our review of counsel's representation is highly deferential, and we indulge a strong presumption that counsel's conduct was not deficient. *Nava*, 415 S.W.3d at 307–08.

An appellate court may not infer ineffective assistance simply from an unclear record or a record that does not show why counsel failed to do something. *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012); *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007). Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Menefield*, 363 S.W.3d at 593. If trial counsel did not have that opportunity, we should not conclude that counsel performed deficiently unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Nava*, 415 S.W.3d at 308. Direct appeal is usually inadequate for raising an ineffective-assistance-of-counsel claim because the record generally does not show counsel's reasons for any alleged deficient performance. *See Menefield*, 363 S.W.3d at 592–93; *Thompson*, 9 S.W.3d at 813–14.

*Strickland*'s prejudice prong requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial—that is, a trial with a reliable result. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. In other words, an appellant must show a reasonable probability that the proceeding would have turned out differently without the deficient performance. *Id.* at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. We must ultimately focus on examining the fundamental fairness of the proceeding in which the result is being challenged. *Strickland*, 466 U.S. at 696, 104 S. Ct. at 2069. "[A] verdict or conclusion only weakly supported by the record is

7

more likely to have been affected by errors than one with overwhelming record support." *Id.*, 104 S. Ct. at 2069.

Moffatt did not file a motion for new trial alleging ineffective assistance of counsel; thus, there was no hearing at which counsel testified regarding trial strategy. *See Ortiz v. State*, 93 S.W.3d 79, 88–89 (Tex. Crim. App. 2002) ("If counsel's reasons for his conduct do not appear in the record and there is at least the possibility that the conduct could have been legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal.").

## B. Analysis

In addition to arguing that securing the admission of the interview videos constituted deficient performance—because the videos "contain[ed] hideously damaging and highly prejudicial evidence"[3]—Moffatt asks us "to review the many footnotes in []his brief" for the "multitude of instances where [his] counsel made objections to hugely damaging intended testimony but failed to preserve them, waiving error." Leaving aside that this court should not be expected to mine a brief's footnotes for critical argument, *see, e.g., Araujo v. State*, No. 11-20-00242-CR, 2022 WL 3092669, at *1 n.1 (Tex. App.—Eastland Aug. 4, 2022, no pet.) (mem. op., not

---

[3]Conversely, Moffatt also takes issue—in a footnote—with the idea that the interviews contained hearsay—as urged by the prosecutor in response to the defense's argument in favor of admitting the first interview into evidence—contending that the prosecutor's hearsay argument against admitting the first interview without also admitting the second interview is exemplary of the State's "bending or ignoring the rules to get a conviction" in this case.

designated for publication); *Kilpatrick v. State*, No. 08-14-00255-CR, 2016 WL 6092961, at *10 (Tex. App.—El Paso Oct. 19, 2016, pet. ref'd) (not designated for publication), we interpret his brief's complaints to assert first that no reasonable strategy could have justified any of counsel's acts or omissions referenced in the brief's body and footnotes. Additionally, Moffatt argues that he was prejudiced—not necessarily because he would not have been convicted based on the jury's apparent determination that the complainant was credible and telling the truth[4] but also because either he would have been entitled to a mistrial or the jury would not necessarily have later assessed the maximum punishment for each offense. *See Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002) ("Under *Strickland*, the defendant must prove, by a preponderance of the evidence, that there is, in fact, no plausible professional reason for a specific act or omission.").

### 1. Forensic-interview recordings

Moffatt argues that "had the defense used the [interview] videos [at] trial to *educate* the jury that [Mother] was steering and controlling and indoctrinating [the

---

[4]Although Moffatt does not challenge the sufficiency of the evidence to prove his convictions, he repeatedly argues in the context of his ineffective-assistance complaint—particularly footnote 11—that the complainant's version of events is untrustworthy. This court may not sit as a thirteenth juror and must defer to a jury's resolution of a witness's credibility. *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017); *Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014). Moreover, to the extent that Moffatt alleges in footnote 11 that his trial counsel was ineffective for failing to call a witness, he has not shown that the witness was available and that he would have benefitted from her testimony. *See, e.g.*, *Perez v. State*, 310 S.W.3d 890, 894 (Tex. Crim. App. 2010) (holding that appellant cannot prevail on ineffective-assistance complaint based on failure to call witness without such proof).

9

complainant,] the outcome of this case would have been much different." We disagree with his assertion that his counsel did not so use the videos to weaken or attack the credibility of the complainant's outcry and the complainant's and Mother's subsequent trial testimony based thereon.

On cross-examination, counsel asked the complainant about preparing for her testimony with the district attorney's office and if she remembered what she told the "lady with long hair," and she replied, "Vaguely." When counsel was unable to get the complainant to agree that what she had told the forensic interviewer was "significantly different" than her trial testimony and asked if it would be helpful to play the video, the complainant answered, "If you want to." Counsel was able to get the complainant to admit that in 2010, she did not disclose to the interviewer that Moffatt had touched her inappropriately while in her bed. She also admitted that she told the interviewer at that time that Mother "would question [her] almost every day about stuff like that."[5]

The complainant also admitted that what she had told the interviewer in the second interview in 2013 showed that she "had pretty significant knowledge about the difficulties between" Mother and Moffatt. The complainant further admitted being

---

[5]Counsel was able to ask another witness later, "Were you made aware . . . in [the forensic interview] that [the complainant] had disclosed that . . . after [Moffatt] left, [Mother] asked her questions about sexual abuse every day until she admitted sexual abuse?"

10

"very upset with" Moffatt at that time. When questioned about her recall of events, the complainant testified as follows:

> Q. And you would agree with me that really, truthfully, your recollections would have been clearer closer to the time of the events, correct?
>
> A. My memories might have been clearer, but my vocabulary was not developed enough to fully explain what I had experienced.
>
> Q. Is that a conclusion that you've come to on your own or has somebody told you that?
>
> A. That's what I've come to on my own.

The forensic interviewer testified that in the first interview, the complainant was "[v]ery tentative" and "testing the waters." But in the second interview, the complainant knew the difference between the truth and a lie and identified Moffatt again as the perpetrator. On cross-examination, the defense asked the interviewer several questions aimed at whether the interviewer thought it unusual for a child complainant to say that a second interview was prompted by the child's criminal complaint being "dropped."

Based on our review of the record, the defense's strategy was evident, and we cannot say that proffering the two interview recordings—rather than trying to prevent them from being admitted into evidence at all—was conduct "so outrageous that no competent attorney would have" done so. Faced with an adult witness who testified unequivocally and unwaveringly, no meaningful forensic evidence, a second victim in similar circumstances, and the passage of a significant amount of time—yet

11

possessing evidence of a potential motive for Mother to have influenced the memories of the complainant—the defense was put in the position of trying to show how the adult complainant could be credible yet wrong. The interviews showing her reluctance to speak and tender age in 2010 compared with her 2013 use of the word *outcry* and knowledge of an unusual amount of detail about the relationship between Mother and Moffatt and the need for a criminal investigation helped take the expert's testimony out of the abstract. The jury was going to have to make a credibility determination between the complainant and Moffatt no matter what; that the interviews ended up reinforcing that determination in the complainant's favor over Moffatt's was a risk but not one showing that counsel's decision was so unsupported by a legitimate trial strategy that it was ineffective. *Cf. Ex parte White*, 160 S.W.3d 46, 55 (Tex. Crim. App. 2004) (holding that "[j]ust because . . . another attorney would have pursued another strategy does not make this [all-or-nothing] strategy unreasonable").

### 2. Mistrial

Moffatt points to several instances in which he claims counsel was ineffective for failing to request a mistrial or, at least, an instruction to disregard.

Whether a mistrial—a remedy of last resort—is warranted is within the trial court's discretion and is fact-specific. *Kipp v. State*, 876 S.W.2d 330, 339 (Tex. Crim. App. 1994); *Berkley v. State*, 298 S.W.3d 712, 714 (Tex. App.—San Antonio 2009, pet. ref'd). A mistrial is proper only when conduct or an occurrence "is so prejudicial that

12

expenditure of further time and expense would be wasteful and futile." *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). The failure to request a mistrial constitutes ineffective assistance only if a mistrial should have been granted. *Weinn v. State*, 281 S.W.3d 633, 641 (Tex. App.—Amarillo 2009), *aff'd on other grounds*, 326 S.W.3d 189 (Tex. Crim. App. 2010); *see Ex parte Jimenez*, 364 S.W.3d 866, 887 (Tex. Crim. App. 2012) ("The failure to object to proper questions and admissible testimony (and the failure to request a mistrial or continuance based upon that questioning) is not ineffective assistance.").

In footnotes five and six of the appellant's brief, Moffatt contends that the defense should have requested an instruction to disregard or a mistrial when—after Mother had already testified that the complainant spontaneously and emotionally replied, "[D]on't touch me there. I don't like to be touched there" at a medical checkup, and the nurse practitioner asked, "[W]ho touches you there, and why don't you like to be touched there"—Mother testified that the complainant responded, "[Moffatt] touches me there." Counsel objected to this testimony, and the trial court initially sustained the objection. But when the prosecutor argued that he was offering the testimony as a prior consistent statement and statement for medical-diagnosis purposes, the trial court overruled the objection on the latter ground.

Trial counsel adequately preserved this complaint for appeal by objecting. *See Osby v. State*, No. 14-17-00641-CR, 2019 WL 2305937, at *5 (Tex. App.—Houston [14th Dist.] May 30, 2019, no pet.) (mem. op., not designated for publication) ("By

13

objecting repeatedly and obtaining rulings overruling his objections to the extraneous offense evidence, counsel preserved the issue for review, and there was no need to request an instruction to disregard." (citing *Hicks v. State*, 837 S.W.2d 686, 691 (Tex. App.—Houston [1st Dist.] 1992, no pet.))). And a mistrial would not have been appropriate; the complainant had already testified that she had "yelled" this very thing during the medical examination. *See, e.g.*, *Redman v. State*, No. 01-19-00680-CR, 2021 WL 1133151, at *4 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op., not designated for publication) (collecting cases noting that in mistrial analysis, similar evidence admitted elsewhere weighs against harm). We conclude that even if trial counsel's decision to forgo further steps regarding this evidence was "not a strategic defense decision [but] a mistake," as argued by Moffatt, he was not prejudiced thereby.

In footnotes 7 and 8, Moffatt argues that his counsel was ineffective for failing to seek a mistrial, or at least to try to make points with the jury by seeking an instruction to disregard Mother's answers regarding why she thought the investigation had stalled—a fact favoring the defense:

Q. What was the response you got about the status of your case?

A. I was told that the detective had died.

[DEFENSE COUNSEL]: Objection, hearsay.

THE COURT: Sustained.

14

Q. (By [the prosecutor]) In your case, the first outcry, the one that happened in 2010, did the police agency just dump the case?

A. No.

[DEFENSE COUNSEL]: Objection, Your Honor. Calls for speculation.

THE COURT: Sustained.

Q. (By [the prosecutor]) Do you know what happened to the case?

A. The case just was sitting open, as far as I know.

Q. Was it as a result of extenuating circumstances?

[DEFENSE COUNSEL]: Objection, Your Honor. Calls for hearsay. (Indiscernible)

THE COURT: Sustained. I'm sorry. I didn't hear the last part.

[DEFENSE COUNSEL]: Speculation.

THE COURT: Sustained, as well.

Although an instruction-to-disregard request would not have been inappropriate, the State had timely disclosed to the defense that the Sheriff's Department investigator— who had knowledge of what had happened to the investigation—would be testifying. *See* Tex. Code Crim. Proc. Ann. art. 39.14(b). And the trial court's sustaining the objections did point out to the jury that Mother's testimony regarding what happened was not based on her personal knowledge.[6] Moreover, Mother's single-word

---

[6]Indeed, that Mother appeared to have some knowledge about the investigation's progress fit into the defense's later questioning aimed at showing that she was the impetus behind the investigation's being continued rather than closed.

15

answer—to which the objection was sustained—was not so prejudicial that it would have been incurable; the investigator later testified to the same.

Moffatt also takes issue with the defense's failure to request an instruction to disregard or a mistrial when its objections to the prosecutor's vigorous cross-examination of a defense witness—aimed at trying to get information on whether Moffatt had access to other young girls while traveling for horse shows and whether she knew if he had let the second victim choose to sleep in his bed—were sustained. First, the witness never answered either question, and the prosecutor moved on. *Cf. Green v. State*, No. 14-23-00104-CR, 2024 WL 3371170, at *10 (Tex. App.—Houston [14th Dist.] July 11, 2024, no pet. h.) (mem. op., not designated for publication) (noting possibility that counsel might have decided to forgo request for an instruction to disregard so as not to draw attention to negative comment). Second, the prosecutor's questions themselves were not so prejudicial that their effect on the jury would have been incurable. Indeed, the prosecutor was able to verify a few questions later that the witness did not know with certainty what had actually happened between Moffatt and the second victim, only that she did not personally believe Moffatt had sexually assaulted that victim. Thus, this isolated instance does not show ineffective assistance.

Moffatt also takes his trial counsel to task for failing to seek an instruction to disregard and a mistrial after the trial court sustained an objection to "inflammatory and improper question[ing]" of one of Moffatt's witnesses, aimed at discrediting the

16

witness's testimony regarding whether it was possible Moffatt could have sexually assaulted the second victim:

> Q. Is it possible that someone was yelling and you were asleep and you don't remember?
>
> A. No.
>
> Q. I assume you're, again, not trying to tell this jury that because someone didn't yell out in that evening then that just means there was no chance she was sexually assaulted like she claims?
>
> [DEFENSE COUNSEL]: Objection, asked and answered.
>
> THE COURT: Sustained.
>
> [PROSECUTOR]: With the yelling part?
>
> THE COURT: Sustained. Let's move on.
>
> [PROSECUTOR]: Pass the witness, Your Honor.

The witness had already answered the question favorably to the defense; the prosecutor's question, while highly challenging and skeptical of the witness's answer, was not so prejudicial that a mistrial would have been warranted, and it did not exceed permissible bounds. *See, e.g.*, *Torres v. State*, No. 04-10-00673-CR, 2011 WL 3610118, at *5 (Tex. App.—San Antonio Aug. 17, 2011, no pet.) (mem. op., not designated for publication). Accordingly, this exchange does not show ineffective assistance by defense counsel.

17

### 3. Evidentiary

While noting that the defense (1) objected on hearsay grounds to the SANE's testifying about what Mother had told the SANE—consisting of Mother's observations that "since [Moffatt] had asked for visitation privileges, [the complainant] had been showing some emotional concerns . . . and exaggerated emotional responses"—and (2) received a ruling overruling the objection, Moffatt argues that the defense should have

- objected further on the ground that the statements could not have been for medical-diagnosis purposes (the hearsay exception argued by the State), having nothing to do with any medical condition of Mother's,

- "presented case law on the issue in support of its objection," and

- "made a Bill of Exceptions"—without explaining what the content of that bill of exceptions should have been.

Although this evidentiary argument was preserved by the defense's objection, Moffatt did not raise it as a separate complaint on appeal. Nor would such a complaint necessarily have resulted in reversal of the judgment. *See, e.g.*, *Burns v. State*, 122 S.W.3d 434, 438 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd); *Sandoval v. State*, 52 S.W.3d 851, 857 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd); *see also Taylor v. State*, 268 S.W.3d 571, 587 n.88 (Tex. Crim. App. 2008) (commenting in footnote, "To the extent [parents] have first-hand knowledge of, e.g., the child's medical history, there is no reason their out-of-court statements should not be admissible under the" medical-diagnosis hearsay exception, but "[o]n the other hand,

if they are only relating, e.g., the cause of an injury as they themselves have been told by the child, it is arguable that the hearsay exception should not apply"). Moreover, considering that the primary defensive theory was that Mother was the instigator and coach of the complainant's allegations, the fact that the objection made clear that the SANE was testifying to what Mother had told her, instead of what the complainant herself had told her, helped make that point. Therefore, declining to further object or request a mistrial could have been reasonable trial strategy. *See, e.g.,* *St. Amand v. State*, No. 01-11-00648-CR, 2013 WL 175705, at *6 (Tex. App.—Houston [1st Dist.] Jan. 17, 2013, pet. ref'd) (mem. op., not designated for publication) (concluding that trial counsel was not ineffective for failing to make bill of exceptions to explore potential witness bias when counsel had not been able to testify regarding reason for not doing so).

Finally, Moffatt argues that counsel was ineffective for failing to object to the second victim's testimony under Rule 403 of the Texas Rules of Evidence. Counsel did object to the testimony under Code of Criminal Procedure Article 38.37, and the trial court held a hearing on its admissibility. However, after the trial court ruled the evidence admissible under Article 38.37, the defense did not further object that the evidence was also inadmissible under the Rules of Evidence, including Rule 403.[7]

---

[7]Notably, however, in a pretrial motion entitled Motion In Limine, the defense not only requested a pretrial hearing to determine the evidence's general admissibility, but also to determine "if such testimony would be admissible under Texas Rules of Evidence 403, 404, 608, or 609."

19

Leaving aside whether the trial court would have abused its discretion by overruling a Rule 403 objection,[8] we conclude that—based on the tenor of the defense's cross-examination of the second victim and its later calling of one of the women present in the condo where Moffatt sexually assaulted the second victim for a second time, a witness favorable to the defense—it is evident that counsel made a strategic decision to cast doubt on the second victim's testimony and to use it to further the defensive theory that Moffatt was the victim not only of Mother's personal vendetta against him but also of a wider conspiracy involving others close to Mother. Counsel was able to elicit testimony that Mother knew about the second victim's allegations as early as 2006, before the complainant's outcry that he alleged Mother had concocted and coached; that the second victim's allegations had never been prosecuted despite her attempts to report the allegations to law enforcement in the responsible jurisdictions; and that by the time of trial, Mother and the second victim were close and talked to each other almost every day. Again, counsel's strategy need not be perfect, error-free, or the best choice under the circumstances; it need only be reasonable. *See White*, 160 S.W.3d at 55. We conclude that counsel's decision not to

---

[8]Our review of the *Gigliobianco* factors leads to the conclusion that the trial court would not have abused its discretion by overruling such an objection. *See Gigliobianco v. State*, 210 S.W.3d 637, 640–41 (Tex. Crim. App. 2006); *Deggs v. State*, 646 S.W.3d 916, 925–27 (Tex. App.—Waco 2022, pet. ref'd); *see also Hammer v. State*, 296 S.W.3d 555, 561–62 (Tex. Crim. App. 2009) (noting that Rule 403 should be used only "sparingly" to bar admission of evidence in "he said, she said" cases so as not to exclude relevant, otherwise admissible evidence that might bear upon the credibility of either the defendant or complainant).

further object to try to exclude the second victim's testimony in its entirety, in favor of attempting to use that witness to further its primary defensive theory, was not so outrageous that no reasonable attorney would have done it.

### 4. No Ineffective-Assistance-Based Reversal

Reasonably effective assistance of counsel does not mean error-free representation. *See Frangias v. State*, 450 S.W.3d 125, 136 (Tex. Crim. App. 2013); *Ex parte Felton*, 815 S.W.2d 733, 735 (Tex. Crim. App. 1991). Isolated instances in the record reflecting errors of omission or commission do not render counsel's performance ineffective, nor can ineffective assistance of counsel be established by isolating one portion of trial counsel's performance for examination. *Wert v. State*, 383 S.W.3d 747, 753 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Considering the above-described claims of ineffective assistance in light of the totality of the representation and the particular circumstances of this case—as we must—we conclude that Moffatt's counsel was not so ineffective as to prejudice the trial's outcome. *See Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011); *Thompson*, 9 S.W.3d at 813.

We overrule Moffatt's first issue.

### Alleged Omissions and Inaccuracies in Reporter's Record

In his second issue, Moffatt contends that—based on the reporter's record's documented instances of discrete noise and sound problems in the courtroom—he is entitled to a new trial (1) because "there is some evidence the microphones in the

courtroom did not record inflammatory, prejudicial and improper words and phrases hurled by the State at defense witnesses on the stand and [at] persons in the gallery supporting the defendant" and (2) because "the defense team, like the courtroom microphones, did not hear the improper words and phrases with enough volume and clarity to make objections to same, or did not hear them at all." We quote the following alleged examples of noise and sound problems with the record—which Moffatt intimates were pervasive—verbatim from his brief:

RR2 at 25: Indiscernible.

RR2 at 32: Air vent noise.

RR3 at 63: " . . . a little feedback noise."

RR3 at 68: Indiscernible.

RR3 at 88: Noise/sound issue.

R3 at 131: Unintelligible multiple speakers.

RR3 at 172: Indiscernible.

RR4 at 170: "I can't hear you."

RR6 at 25: The Court: "I want no further outcry from the gallery or I will have you removed or placed in jail."

Because this summary is not a full representation of the context of these supposed noise and hearing problems, we set forth the cited portions of the record below in more detail.[9]

**Volume 2**

Volume 2 was taken of voir dire on May 15, 2023. In the first instance complained of, the prosecutor was speaking:

> And so the question really is can you -- I understand. We'll talk about feelings. These cases, even without having been a witness in them, are going to evoke very strong feelings from everyone. . . . That's how this works.
>
> But I promise you, I (indiscernible)
>
> COURT REPORTER: Mr. [Prosecutor].
>
> [PROSECUTOR]: I get jurors all the time. So while I understand while it might bring strong emotions up, can you do what you're asked and just follow the law and set aside your experiences for this particular case?
>
> VENIREPERSON: Also, being a teacher, I don't think so.

Later, the prosecutor and a venireperson had the following exchange:

> [PROSECUTOR]: . . . [W]hat kind of a case [did you serve on]?
>
> VENIREPERSON: It was a DWI.

___

[9]The record contains no contemporaneous or close-in-time objections or other indications that any of Moffatt's "three and sometimes four" defense attorneys were unable to, or had a hard time, hearing the proceedings in general or that they thought anyone else in the courtroom was having that problem. Nevertheless, in an abundance of caution, we review all of these instances pointed out by Moffatt to discern if the record reveals a pervasive noise and sound problem in the courtroom that would have impacted his attorneys' ability to hear matters that should have been included in the reporter's record.

[PROSECUTOR]: You have a very pretty but very quiet voice.

VENIREPERSON: Thank you. I'm sorry.

[PROSECUTOR]: What you don't know is there's an air vent above me that's just raging. So if you're on this side, all you hear is air vent.

VENIREPERSON: Oh, okay.

[PROSECUTOR]: So you've got to speak up for me.

VENIREPERSON: Okay. It was a DWI.

[PROSECUTOR]: When?

VENIREPERSON: About three years ago.

[PROSECUTOR]: Where was that?

VENIREPERSON: I was in Dallas County.

In the first instance above, the prosecutor appears to have repeated his initially indiscernible answer based on a warning from the court reporter. And in the second, the venireperson repeated her initially quiet response (although picked up by the court reporter), and the prosecutor and venireperson appeared to understand each other for the rest of the colloquy.

**Volume 3**

On the first day of trial, on direct examination of the complainant, a minor technical issue arose:

Q. And you would agree with me that that interview was done, I guess, closer in time to when you allege that these incidents occurred?

A. Mm-hmm.

THE COURT: Sorry. We were getting a little feedback noise.

[DEFENSE COUNSEL]: Sorry, Your Honor.

THE COURT: Not your fault.

Q. (By [Defense Counsel]) . . . [I]f you wouldn't mind for purposes of the record that is being made in this trial, if I ask you a question, if you don't mind answering out loud rather than shaking the head or nodding.

A. Okay.

Q. It's hard for the court reporter to take that down.

A few pages later, the following occurred while the complainant was testifying:

Q. Okay. So are you saying that you knew all these things at the time but that you just didn't disclose them?

A. (Indiscernible)

COURT REPORTER: I'm sorry. What was the answer?

THE WITNESS: Yes.

In both of the above excerpts, the attorney or reporter took corrective action prompting an audible and understandable answer from the witness. And the feedback issue in the first excerpt does not appear to have affected anyone's hearing the proceedings, including the court reporter.

On the same day of trial, the State began its direct examination of Mother by stating the following:

Q. I know I warned you about keeping your microphone where she can hear you. I'll try to move mine so I can do the same.

25

A. Okay.

Q. . . . [I]ntroduce yourself to this jury, please.

A. My name is . . . .

Q. And, . . . I think I told you to just make sure that you keep your voice up in that microphone so we can all hear you. Okay?

A. All right.

Q. One thing I do want to remind you is that when we are talking, this nice lady is writing down everything we say. She can't write down two people at the same time.

A. All right.

With the same witness, during a hearing outside the jury's presence, the

following exchange occurred:

Q. Well, I'm telling you those are her words.

A. Well, I haven't --

[PROSECUTOR]: Okay. Objection.

(Unintelligible multiple speakers)

THE COURT: Okay. Everybody chill.

[PROSECUTOR]: I know we're doing a hearing outside the presence, but it's getting a little bit hostile . . . .

The first exchange above involves a typical reminder to a witness to slow down

or speak up, and the latter illustrates the altogether-not-unusual difficulty facing court

26

reporters trying to transcribe testimony when multiple speakers are speaking at the same time.

Later that day, the following exchange occurred:

Q. When you were gauging how to adjust this forensic interview, the fact that (indiscernible) --

COURT REPORTER: [Prosecutor].

Q. (By [Prosecutor]) When she can't even give you her full name, does that mean that you're expecting to do a specific sort of a developmental-adjusted interview?

A. Yes.

This exchange is yet another example of the court reporter's reminding the prosecutor about the need to speak clearly and sufficiently for the record.

**Volume 4**

Toward the end of the second day of testimony, during a bench conference, defense counsel indicated that she could not hear the responsive argument, and the prosecutor restated the beginning of his sentence:

[DEFENSE COUNSEL]: She opened the door when she said I approach all of my cases with no bias whatsoever.

[PROSECUTOR]: No, you're not understanding. I have to --

[DEFENSE COUNSEL]: I can't hear you.

[PROSECUTOR]: I have to have an opportunity to present evidence to counter this, meaning I will have to go through all of these bad acts to explain why she has made this statement.

This bench conference occurred after the trial judge had admonished one of Moffatt's attorneys during a prior bench conference to be quieter lest the jury hear what was being said.[10] This is some indication that the attorneys may have then attempted to keep their voices down during the remaining bench conferences. Nevertheless, as with prior occasions, the prosecutor repeated the beginning of the sentence with his argument, and there is no further indication in the record that defense counsel could not hear it.

**Volume 6**

On the last day of trial, before the defense rested, the following exchange indicated that there had been some outburst in the courtroom:

Q. (By [Defense Counsel]) In the horse world environment, is it normal for trainers to travel with and stay with their trainees?

A. Yes.

[DEFENSE COUNSEL]: No further questions, Your Honor. Pass the witness.

. . . .

BY [PROSECUTOR]:

Q. I assume it's also not normal in the horse world to then rape your trainees, right?

[DEFENSE COUNSEL]: Objection, Your Honor. Argumentative.

---

[10]The judge also referenced that the courtroom's microphones were somewhat sensitive: "[Y]'all need to be just a little more subtle in talking to each other because every time you get up, the microphone is picking it up. It's distracting."

28

THE COURT: I'll sustain the objection.

I want no further outcry from the gallery, or I will have you removed or placed in jail. So please do not do that.

Although the attorney making the objection heard the prosecutor's statement enough to object to it, he chose not to make a record of the nature of the outburst.[11] Nor can we infer from this excerpt that none of Moffatt's attorneys heard it.

After reviewing all of these instances, in context, we conclude that they do not indicate that a pervasive problem with noise and sound in the courtroom affected the court reporter's ability to accurately and completely transcribe the record.

**Abatement**

After this appeal was filed, Moffatt filed in this court a motion to abate for the trial court to address alleged deficiencies and inaccuracies in the reporter's record. He attached six[12] sworn affidavits to his motion, two of which are from Moffatt's trial

---

[11]This is not surprising, considering that the trial judge later remembered the "animosity . . . that was in the courtroom." For example, she remembered that after the trial, at least one of Moffatt's supporters was "stopped by the bailiff for flipping off the jury when they left." But the trial judge did not name the person who had done so.

[12]In the motion's body, counsel stated that he had "been contacted by seven adult individuals who were witnesses in the Moffatt trial or who observed the trial from the gallery." Although in his motion counsel identifies the individual who did not make a sworn statement, and purports to quote verbatim from "a document she provided to" him, he did not attach that document to the motion, as he did with the sworn statements.

witnesses, including his wife, Lisa Moffatt.[13]  We granted Moffatt's motion to abate and ordered the trial court to hold a fact-finding hearing regarding the reporter's record's accuracy.  *See* Tex. R. App. P. 34.6.

At the hearing, the reporter testified that she uses a steno machine that uses a computer program to type verbatim what is said from the witness stand and in the courtroom—if she can hear it:  "If I can hear it, it's in the record."  Additionally, three times, she reviewed the record simultaneously with the audio recording;[14] she could hear everything that was transcribed, but in all the times she reviewed the audio

---

[13]One of the affiants alleges that the prosecutor "stood and proceeded to *holler . . . '*This is ridiculous (or similar word), and I have never seen anything like this in my years as a prosecutor!'"  [Emphasis added.]  She also alleges that the prosecutor asked Lisa—who had favorably compared Moffatt's character to that of her father— whether her father "was also a rapist and pedophile" and that the prosecutor—while addressing the gallery—stated, "And even worse, that's a predator with a whole courtroom of degenerates over here supporting him, throwing a fit every time they hear the evidence."  The affiant alleges that the word "degenerates" was changed to "people" in the reporter's record but that it is unclear where the word "degenerates" should be included in that record because of the "tampering of the transcripts themselves."  The other affidavits include similar allegations but with slightly different wording—one alleges that the prosecutor "*screamed* that Mr. Moffatt is a pedophile and called us [his supporters] degenerates enabling him."  [Emphasis added.]  Another of the affiants expresses "concerns that the transcript from this trial has been deliberately altered for purpose of collusion to improve the appearance of the prosecution of this case.  To deliberately hide any misconduct by the prosecution."

[14]The reporter described this process:

It [the audio recording] is time synced to the record as I am writing.  It is coming up in English on my computer . . . .  [, a]nd the audio is time synced to that.  So if I pull up my . . . the transcript in that program, I can find the spot, refer to, hit play, and the audio will play right at that part.

recording, she never heard any of the alleged statements asserted in the abatement-motion attachments.

The trial court also provided detail about how the court's microphones work:

THE COURT:  So the only thing -- the only other thing that -- in this courtroom, generally speaking, when we have a lot of people like that are here now, and if we have -- so we can display electronics.  And so we -- those back mics get turned off.  So we don't pick up -- I don't pick up.  I don't think it affects her [the reporter's] mics.  Her mics are different, but now they're all in sync, so to speak.

But like, you know, you get ambient noise.  If I leave those mics on when the jury panel is out there, I can hear them, you know, reaching in their pockets.  So -- which is what we're trying to hear. . . .

As the trial court noted in the abatement hearing, the alleged inaccurate statements and omitted comments were made without objection from the "three . . . sometimes four" defense counsel present.

The trial judge offered to allow Moffatt's appointed appellate counsel to review the audio recording and record along with the court reporter.  After doing so, counsel sent the trial court an email—which is included in a supplemental clerk's record with the trial court's eventual fact-findings—in which counsel stated that "Neither [he nor the court reporter] . . . could find a single instance of any alleged statement in the audio recording, or within the word for word dictation of the audio recording."  But he went on to say that

[t]here was one instance when [the] trial prosecutor . . . began a sentence, [and one of Moffatt's attorneys] objected loudly during that sentence, and perhaps other voices are also heard at the same moment in the audio recording.   The   latter   half   of   [the   prosecutor's]   sentence   is

31

indecipherable on the audio recording and in the word for word dictation. What the jury heard, or did not hear, of that sentence, remains unknown.

In his brief, Moffatt contends that none of this means that the prosecutor's alleged unrecorded statements were not made, simply that the microphones did not pick them up and that defense counsel either did not hear them or heard them but did not object—which he contends is further evidence of ineffective assistance.

After also listening to the audio recording, the trial court expressly found that the reporter's record is "accurate and complete" and "conforms [both] to what occurred during the trial and what is contained on the audio recording of the trial." This court is not authorized to make fact-findings, only to review them. *See Harris v. State*, No. 02-12-00091-CR, 2014 WL 1389756, at *2 (Tex. App.—Fort Worth Apr. 10, 2014, pet. ref'd) (mem. op., not designated for publication) (noting that in context of determining record dispute, trial court is factfinder); *cf.* Tex. Code Crim. Proc. Ann. art. 38.04 (announcing same principle for jury as factfinder). The trial judge reviewed the sworn and unsworn allegations of alleged inaccuracies and omissions, heard the testimony of the court reporter at the abatement hearing, considered that neither the reporter nor Moffatt's appointed appellate counsel could hear any of the alleged inaccuracies or omissions after subsequently reviewing the record and audio recording, and—as reflected in the fact-findings—listened to the recording herself. We must defer to the trial court's fact-finding that the reporter's record provided to this court accurately represents the trial proceedings and that no material part of it has

been lost or destroyed.[15]  *See Harris*, 2014 WL 1389756, at *2; *Jaynes v. State*, 216

S.W.3d 839, 844 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.).

Accordingly, we overrule Moffatt's second issue.

## Conclusion

Having overruled Moffatt's two issues, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  August 22, 2024

---

[15]For the same reason, we decline to infer that defense counsel at trial must have heard the unrecorded, undiscernible, allegedly made comments and simply failed to preserve a complaint about them.